UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHARLES D. ROBERTSON,

           Petitioner,

    v.

KELLY SANTORO,

           Respondent.

Case No. 17-cv-04201-EMC

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## I.      INTRODUCTION

Charles D. Robertson filed this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge his murder conviction and sentence from San Francisco County Superior Court. Respondent has filed an answer to the petition, and Mr. Robertson has filed a traverse. For the reasons discussed below, the petition is denied.

## II.      BACKGROUND

A.      The Crime

The California Court of Appeal described the evidence presented at trial:

**I. The Prosecution's Case.**

On January 12, 2012, at around 2:30 a.m., Police Officer Anthony Pedroza, was dispatched to Sixth Street and Stevenson Alley in San Francisco. Upon his arrival, Officer Pedroza found Joseph Minozzi (hereinafter, the victim) lying about ten feet from the curb with a stab wound in his chest. The victim was breathing shallowly. Despite attempting CPR, paramedics were unable to save him, and he ultimately bled to death. The victim's stab wound was over five inches deep, passing through his stomach and aorta before entering his vertebrae. No knife was recovered from the scene.

An autopsy revealed the victim had several narcotics in his system at

the time of death, including methadone and codeine.  Opiates, such as these, are depressants that tend to de-energize a person's central nervous system; however, persons suffering from opiate withdrawal can become irritable, aggressive, and argumentative.

Officer Pedroza recognized the victim as someone he had encountered at about 1:30 a.m. on Market Street, close to where he died.  At the time, the victim was involved in a loud verbal altercation with his girlfriend, L.W., as well as the security doorman of a nearby strip club.  Officer Pedroza and his colleagues investigated the situation, but ultimately found no cause to search or arrest the victim.  By the time the officers left the scene, the victim appeared to have calmed down.

During the course of the police investigation into the victim's subsequent death, the officers recovered surveillance videos from several nearby businesses, including three hotels on or near Sixth Street, a pizza restaurant on Sixth Street and the Stop and Go Market near Sixth and Stevenson Alley.  Some of these videos showed Stevenson Alley, near to where the victim's body was found, and one of the videos—from Stop and Go Market—showed the victim prior to his death.  Specifically, this video showed the victim approach the counter inside the store, light his cigarette, and then leave.  As he did so, the victim is seen interacting with defendant, who then followed the victim outside the store.  The victim walked toward Stevenson Alley, less than 50 feet from the store, with defendant following behind him.

Video taken from Pranzo Pizza on Sixth Street, in turn, shows the victim walk into the alley.  Shortly thereafter, defendant also walks into the alley.  Defendant is seen pursuing the victim, who suddenly turns and jumps as if pulling up his pants.  At this point, defendant stabs the victim, and then flees.

According to D.J., defendant's 19–year–old girlfriend, the couple were staying at the Vagabond Inn on Ninth Street on the day in question.[2]  In the early morning hours, D.J. awoke to find defendant, appearing anxious.  He told her that "something happened," an "altercation" on Sixth Street, and that he needed her to dispose of his knife.  She agreed, taking the knife from defendant after he wiped it off and disposing of it in the gutter of a nearby alley.  Defendant did not give D.J. any specific information that night about what had occurred, and she did not ask for any, although she assumed his statement that, "he got into something," meant he had been attacked.  Later, on Facebook, defendant told her he had been attacked.[3]

[Footnote 2:]  Defendant was 42 years old when he met D.J.
[Footnote 3:]  D.J. testified under a grant of immunity.

After D.J. disposed of the knife, she and defendant left the hotel, travelling to Fairfield and Sacramento before taking a bus to Atlanta under assumed names.  Two weeks later, however, D.J. returned to the Bay Area without defendant, and was met at the bus station by her mother and the police.  D.J. gave a statement to San Francisco Police Inspector Daniel Dedet, admitting to him that she had disposed of defendant's knife.  She accompanied the police to the

alley at Eighth Street and Ringold Alley where she recalled disposing of the knife, but they could not find it. She also identified from a photograph defendant's jacket, which had been found in Room 18 of the Vagabond Inn. She admitted to police that she had placed the jacket under the bed at defendant's request.

On January 25, 2012, police searched Room 18 of the Vagabond Inn and found a jacket under the box springs of the bed. DNA from this jacket matched defendant's DNA profile. Police then searched the gutter at Eighth Street and Ringold Alley, but could not locate a knife. Other evidence found during the police investigation established that defendant paid cash for bus tickets at the Sacramento Greyhound Station on January 13, 2012.

In late January 2012, Inspector Dedet interviewed defendant upon his return from Atlanta. Defendant denied any knowledge of the victim's stabbing, and denied any involvement in an altercation on Sixth Street in the early morning hours of January 12, 2012.

**II. The Defense Case and Rebuttal.**

Nabil Jemai, a taxi driver, testified that, at about 2:20 a.m. on the night in question, he noticed a female on Sixth Street screaming for someone to call 911. Jemai then saw the victim lying on the ground in Stevenson Alley and, thus, called 911. About this time, he saw someone bend over the victim's body and remove the victim's wallet. This person took money from inside the wallet before discarding it. This person's actions were captured on surveillance video and he was later identified and interviewed by police. During the interview, this person acknowledged taking the victim's wallet, but nothing else, from his pockets.

John Rongley, Jr., testified that, while providing security for a Market Street cinema near Sixth Street in the early morning of January 12, 2012, he saw the victim push his girlfriend (L.W.) and yell at her "at the top of his voice." Rongley then saw the victim angrily slap L.W.'s cell phone from her hand, causing it to shatter. Rongley asked the victim to leave the area, as he was impeding business, to which the victim responded: "Fuck you, little bitches. I'll take the God damn walkie-talkie and shove it up your ass." While the victim continued making threatening gestures towards Rongley, a police car drove by and the victim left, walking down Market Street.

Officer Hector Rodarte confirmed the victim was seen in a heated argument with his girlfriend outside the Market Street Cinema at about 1:45 a.m. on January 12, 2012. Other officers had already spoken to the victim by the time Officer Rodarte arrived. His colleague, Officer Pedroza, was among the first to respond to the cinema. According to Officer Pedroza, once they separated the victim and his girlfriend, the victim appeared to get "under control," although he remained agitated and talking loudly. Officer Pedroza did not see or hear reports of the victim pushing or hitting his girlfriend and, ultimately, the couple walked away together. Officer Pedroza and his partner, Officer Frost, found the victim lying in the street about an hour after they encountered him at the

cinema.  His girlfriend, L.W., was also present.  She admitted having a "loaded" syringe in her pocket, and possibly methadone pills.  She reported the victim was "detoxified" from heroin use, but had been dropped from a rehabilitation program and had purchased "street methadone" to "keep himself level" without getting high. [4]

[Footnote 4:]  L.W. later told defense counsel that, on January 11, 2012, the victim had injected himself with heroin and given her the empty syringe.  L.W. also reported that she and the victim were in a methadone treatment program at the time of his death.

Defendant testified in his own defense.  He explained that, in January 2012, he and D.J. had been dating five or six months.  He found out soon after they began dating that D.J. was a prostitute.  Defendant asked her to stop prostituting because he was concerned for her safety, but she told him "she had been doing it before she met [him] and that she understood what she was doing...."  Defendant thus "went along with it" and began to help her in order to keep her safe.  Specifically, defendant would go with her to jobs to "screen[ ] the guys that she was dealing with," and D.J. would give him the money she collected, which generally totaled about $400 to $500 per day.  Around November 2011, D.J. stopped working.  The couple remained together, but their relationship was volatile and they broke up and got back together several times.  In January 2012, D.J. accompanied defendant to Atlanta.  Although he did not want her to go, he "didn't want to just leave her ... on the streets."

On January 10, 2012, defendant travelled to San Francisco with D.J. from his home in Fairfield to meet his new granddaughter.  They stayed at the Vagabond Inn from January 10 to 12.  On January 11, he visited his granddaughter in the afternoon, and then returned to his room.  At about 1:00 a.m., he left to buy food and cigars.  He went to the Stop and Go Market and bought ice cream.  There, he encountered the victim, blocking the entrance.  Defendant told the victim, "excuse me," as he tried to leave the store, and the victim responded by "shouldering" him in the chest.  Shocked, defendant said, "What's your problem, man?"  The victim said something about a girl, and defendant told him, "Man, just get out of my face."  The victim then left the market ahead of defendant without further comment.  Defendant likewise left the store, while "continuing to ask him what his problem was because he was still looking at me kind of aggressively.... So ... I was like, 'What is the problem?'"  The store owner told them both to get away from the front door.

According to defendant, the victim, from about 10 to 15 feet away, told him, "Come over here and talk to me."  Defendant described the victim as "a little agitated," as if defendant had "done something wrong to him."  Defendant could tell the victim was high, and thought perhaps the victim had mistaken him for someone else.  Defendant "agreed to go a certain distance with him" in order to talk to him to determine what the problem was.  As the victim walked further ahead, turning into the alley, defendant "lagged behind" because he did not want to catch up with the victim too fast.  Defendant did, however, want to "keep his eyes" on the victim to

1

see what he was up to.

2

When defendant reached the corner of Sixth Street and Stevenson Alley, the victim told him to "come on back here." Defendant responded, "Man, I'm not going back there with you." Although defendant was ready to leave the situation, the victim took a "fighting stance, like a UFC fighter." Defendant, trying to stay calm, told him, "Man, whatever the problem is, we can talk about it." As defendant later explained, he wanted to resolve any issue there was between them, so that he did not have to worry about a future physical altercation. However, when defendant again asked the victim what his problem was, the victim stated, "I got you now, you Black fuck." The victim was continually moving, making it hard for defendant to focus on what he was doing, After "jumping around" for a few minutes, the victim reached inside his clothing, leading defendant to believe he had reached for a weapon: "So I want to keep my distance from him, but I also want to be close enough to where if he does pull out a weapon, I can defend myself." Defendant then reached into his pocket to place his hand on the knife that he carried with him for protection. And, when the victim took his hands behind his back, defendant took out his knife and stabbed him. While the victim at no point swung at him before the stabbing, defendant was worried because "I couldn't see his hands anymore." Defendant then left the alley, telling bystanders to call 911.

3

4

5

6

7

8

9

10

11

12

13

Defendant acknowledged telling D.J. to dispose of his knife and to place the jacket he was wearing under the bed. Defendant explained that he "panicked a little bit." He later spoke to friends and family, who told him to call the police, but he chose not to because he had prior convictions and did not think he would be treated fairly. He left for Atlanta to give himself time to think about what to do, but returned to California 10 or so days later, after D.J., who had already returned due to a conflict between the couple. Upon his return, defendant was interviewed by Inspector Dedet. Defendant denied any involvement in the stabbing because he "didn't know what to say."

14

15

16

17

18

19

On cross-examination, defendant admitted he was depicted in the surveillance video stabbing the victim in Stevenson Alley. Defendant admitted that he stabbed the victim with enough force to penetrate the knife into the victim's back, and that he never saw the victim with a weapon. He also admitted travelling with D.J. to Atlanta under a fictitious name, and slapping D.J. while in Atlanta. With respect to his initial encounter with the victim, defendant acknowledged his voice could be heard on the surveillance video telling him, "Get the fuck out of my face." The victim did not respond. The video does not reflect defendant saying, "excuse me," to the victim. Defendant did ask him what his problem was and, in response, the victim mentioned something about "my girl." Defendant was acquainted with several people outside the Stop and Go Market that evening. But he was not acquainted with the victim and was not aware of what kind of mood the victim was in or that the victim had been involved in a verbal altercation with his girlfriend earlier in the evening on Market Street. He could tell the victim was high, however, by the look on his face.

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

5

1

2

3

4

> Defendant generally carried a knife on a clip in his pocket so that he could easily access it if it became necessary to defend himself. Himself a victim of several past violent assaults, defendant carried the knife for protection instead of a gun because he had a prior arrest for carrying a firearm.  The knife opened with the push of a lever. On the night in question, defendant pulled out the knife and stabbed the victim in one continuous motion as the victim stood facing him.

5

*People v. Robertson,* No. A141587, 2016 WL 3014803, *1-4 (Cal. Ct. App. May 18, 2016).

6

B.    Procedural History

7

Following a jury trial in San Francisco County Superior Court, Mr. Robertson was

8

convicted of first-degree murder and was found to have personally used a deadly weapon in the

9

commission of the offense.  On March 10, 2014, he was sentenced to a total of 26 years to life in

10

prison.

11

Mr. Robertson appealed.  The California Court of Appeal affirmed his conviction in 2016.

12

The California Supreme Court denied his petition for review without comment in 2016.  He also

13

filed unsuccessful state habeas petitions.

14

Mr. Robertson then filed this action seeking a federal writ of habeas corpus.  Eventually,

15

he filed a second amended petition.  The following claims in his second amended petition for writ

16

of habeas corpus remain for adjudication:  (1) the trial court's denial of a defense motion

17

challenging the prosecutor's peremptory challenge to an African-American prospective juror

18

violated Mr. Robertson's constitutional rights to a fair trial and equal protection of the laws; (2)

19

Mr. Robertson's due process right to present a complete defense was violated when the trial court

20

excluded evidence of the victim's convictions and the victim's statement that he wanted to buy a

21

knife; (3) Mr. Robertson's right to due process was violated by the admission of evidence that he

22

was a pimp, that Delona Jacobs was his prostitute, and that he had hit Ms. Jacobs; (4)

23

prosecutorial misconduct during closing argument violated Mr. Robertson's right to a fair trial and

24

an impartial jury; (5) cumulative error; and (6) Mr. Robertson's right to due process was violated

25

because the evidence was insufficient to show the premeditation and deliberation necessary to

26

convict him of first-degree murder.   Respondent has filed an answer, and Mr. Robertson has filed

27

a traverse.  The matter is now ready for decision.

28

United States District Court
Northern District of California

6

1

### III.    JURISDICTION AND VENUE

2

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under

3

28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition

4

concerns the conviction and sentence of a person convicted in San Francisco County, California,

5

which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

6

### IV.    STANDARD OF REVIEW

7

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

8

custody pursuant to the judgment of a State court only on the ground that he is in custody in

9

violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

10

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254

11

to impose new restrictions on federal habeas review.  A petition may not be granted with respect to

12

any claim that was adjudicated on the merits in state court unless the state court's adjudication of

13

the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application

14

of, clearly established Federal law, as determined by the Supreme Court of the United States; or

15

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of

16

the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

17

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

18

arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

19

the state court decides a case differently than [the] Court has on a set of materially

20

indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

21

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if

22

the state court identifies the correct governing legal principle from [the Supreme] Court's

23

decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.

24

"[A] federal habeas court may not issue the writ simply because that court concludes in its

25

independent judgment that the relevant state-court decision applied clearly established federal law

26

erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  "A

27

federal habeas court making the 'unreasonable application' inquiry should ask whether the state

28

court's application of clearly established federal law was 'objectively unreasonable.'"  *Id.* at 409.

United States District Court
Northern District of California

Section 2254(d) generally applies to unexplained as well as reasoned decisions.  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  When the state court has denied a federal constitutional claim on the merits without explanation, and there is no lower state court decision to "look through" to, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court."  *Id.* at 102.

## V.    DISCUSSION

A.    *Batson* Claim

Mr. Robertson contends that the prosecutor's use of a peremptory challenge to exclude an African-American man from the jury violated the Fourteenth Amendment right to equal protection.

    1.    Background

Mr. E. was an African-American prospective juror who was put in the jury box for voir dire.  "Although the prosecution accepted Mr. E. on the panel on the first day of voir dire, the prosecutor made a peremptory challenge to Mr. E. on the second day of voir dire after defense counsel made several of his own challenges, which, according to the prosecutor, 'changed the complexion of the jury.'"  *Robertson*, 2016 WL 3014803, at *5.  After Mr. E. was excused, only one African-American prospective juror remained in the jury pool; no African American jurors were on the jury panel for Mr. Robertson's trial.  (Further details on the voir dire and exercise of peremptories are contained in the state appellate court's decision, quoted later in this section.)

The trial court denied Mr. Robertson's motion for a mistrial under *Wheeler/Batson*, concluding that he had not made a prima facie case of discrimination.  ART 321-322.[1]

_____

[1] The Augmented Reporter's Transcript (ART) is found in Docket No. 22-15.

United States District Court
Northern District of California

1    The California Court of Appeal rejected Mr. Robertson's claim that the prosecutor had

2 violated the Equal Protection Clause by exercising a discriminatory peremptory challenge against

3 Mr. E.  The California Court of Appeal recited the three-step process for analyzing allegedly

4 discriminatory peremptory challenges derived from the key state and federal cases of *People v.*

5 *Wheeler*, 22 Cal. 3d 258 (Cal. 1978), *overruled on other grounds by Johnson v. California*, 545

6 U.S. 162 (2005), and *Batson v. Kentucky*, 476 U.S. 79 (1986).

> When, as here, a defendant challenges the prosecution's use of
> peremptory strikes by way of a so-called *Wheeler/Batson* motion, he
> or she must comply with the following procedures.  First, the
> defendant must "make out a prima facie case 'by showing that the
> totality of the relevant facts gives rise to an inference of
> discriminatory purpose.' [Citation.]"  (*People v. Williams* (2013) 56
> Cal.4th 630, 649.)  Second, if the defendant succeeds in making this
> prima facie case, "the 'burden shifts to the State to explain
> adequately the racial exclusion' by offering permissible race-neutral
> justifications for the strikes.  [Citations.]  Third, "[i]f a race-neutral
> explanation is tendered, the trial court must then decide ... whether
> the opponent of the strike has proved purposeful racial
> discrimination." [Citation.]'  (*Johnson v. California* (2005) 545
> U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410], fn. omitted.)"
> (*People v. Williams, supra*, 56 Cal.4th at p. 649; see also *People v.
> Johnson* (1989) 47 Cal.3d 1194, 1216.)

16 *Robertson*, 2016 WL 3014803, at *5.  The state appellate court also mentioned that the existence

17 or nonexistence of purposeful racial discrimination is a question of fact and that a trial court's

18 denial of a *Wheeler/Batson* motion must be upheld if "'fairly supported by substantial evidence in

19 the record, giving deference to the trial court which had the opportunity to observe . . . the juror.'"

20 *Id.* (citations omitted).

21    The California Court of Appeal found "no grounds for disturbing the trial court's denial"

22 of the *Wheeler/Batson* motion at the first step for failure to make a prima facie case.  *Id.*  The state

23 appellate court noted that the trial court had not proceeded to the second or third step, but the

24 prosecutor nonetheless elected to state for the record his race-neutral justifications for striking Mr.

25 E.  *Id.* at *6 & n.6.  The state court of appeal also noted that the trial court appeared to have taken

26 the prosecution's statement into consideration, but that it was unnecessary for the state appellate

27 court to look at the "nuances" of the trial court's reasoning because there was no evidence of

28 purposeful racial discrimination.  *Id.*

United States District Court
Northern District of California

As the record in this case reflects, the prosecutor relied upon the following facts to justify his excusal of Mr. E. from the jury pool. At the start of voir dire, Mr. E. asked the court for a hardship dismissal, but it was denied by the court. According to his questionnaire, Mr. E. claimed hardship because he was an unmarried father of two infant twin children with steady employment in customer relations in the airline industry. In addition, the prosecutor noted that, during voir dire, he asked the entire panel of prospective jurors, including Mr. E., detailed questions on the issue of racial bias: "Is there anybody here who thinks because [defendant is] African American or a Black man that he must be guilty? That they have some sort of race issue—racism against African Americans? Because that wouldn't be fair, and we don't want you as a juror. [¶] Does everybody understand that? In response to this questioning, Mr. E. expressed no misgivings regarding his ability to fairly discharge his duties as juror.

At the subsequent *Batson/Wheeler* hearing, the prosecution denied having any discriminatory purpose or animus when using one of his peremptory challenges to strike Mr. E. Rather, the prosecutor insisted his decision stemmed primarily from Mr. E.'s hardship questionnaire: "The Court, I'm sure, has observed me asking each and every potential juror who has filled out a questionnaire regarding their ability. And I have been dismissing most of those who filled out hardship requests."

Defense counsel, for his part, pointed out that Mr. E. stated in voir dire that he would not hesitate to convict an African American man of a crime if the evidence proved him guilty, and that his hardship concerns would not prevent him from being a fair juror. Defense counsel also noted there were seated jurors who, like Mr. E., were employed with young children. The prosecutor responded that these other seated jurors, unlike Mr. E., were married.

After hearing from counsel, the trial court denied defendant's *Batson/Wheeler* motion, emphasizing that no prima facie showing had been made that Mr. E. was excused from the jury pool for any impermissible reason. The trial court then added that, "[u]nfortunately, ... we have few African–Americans on our jury panels, in this case we have had only five in our total venire. Three actually made it to the box of twenty-four. Two were excused for cause. [¶] Before the challenge was made one was excused for cause, two remained. And the [District Attorney] excused one, leaving another ... person of African descent in the first group of twelve. And two additional people in the audience, one of which then made it to the panel but was excused for cause again."

Having considered this record as a whole and in a deferential light, we conclude substantial evidence supports the trial court's finding that no reasonable inference was raised that the prosecutor acted for other than a race-neutral purpose. First, as the trial court noted, "as a practical matter the challenge of one or two jurors can rarely suggest a pattern of impermissible exclusion." (*People v. Bell, supra,* 40 Cal.4th at p. 597–598 [explaining that, "While the prosecutor did excuse two out of three members of this group [of

African American women], [fn. omitted] the small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible"].)[7]  Here, the prosecutor had already exercised eight peremptory challenges up to that point, none of which were directed at African American prospective jurors.  Yet, on appeal, defendant challenges only the prosecutor's decision to strike Mr. E., a circumstance weighing against finding the existence of any pattern of striking prospective jurors on the basis of group bias.[8]

> [Footnote 7:]  As the California Supreme Court was quick to note, while "circumstances may be imagined in which a prima facie case could be shown on the basis of a single excusal, in the ordinary case, including this one, to make a prima facie case after the excusal of only one or two members of a group is very difficult."  (*People v. Bell, supra*, 40 Cal. 4th at p. 598, fn. 3.)

> [Footnote 8:]  Defendant points out that, just before the prosecutor's challenge of Mr. E., the prosecutor exercised a peremptory challenge against a juror who, although not herself African American, was married to and shared two children with an African American male.  However, as reflected in our discussion from above, defendant did not challenge the prosecutor's use of a peremptory challenge in this instance.  Moreover, the record reflects the prosecutor questioned this female prospective juror extensively during voir dire regarding the fact that she served as one of the Mayor's senior advisors and had quite strong opinions regarding San Francisco crime and, more generally, our criminal justice system, providing a legitimate non-discriminatory basis for the prosecutor's decision to strike her from the jury pool.

Second, as we previously stated, a defendant's prima facie showing may be "supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all." (*People v. Bell, supra*, 40 Cal.4th at p. 597.)  In this case, quite to the contrary, the prosecutor asked very direct and poignant questions regarding the jurors' ability to fairly discharge their duties in a race-neutral manner, a circumstance adding further support for the trial court's finding.

Finally, even were we to assume for the sake of argument that a prima facie showing was made, we would nonetheless conclude on the totality of this record that the prosecutor's stated reason for using a peremptory challenge to strike Mr. E. from the panel—to wit, his hardship concerns arising from the fact that he was an unmarried father to two infant children with steady employment in the airline industry—was permissibly race-neutral.  As the prosecutor explained, he struck several potential jurors on the basis of their hardship concerns, including those of other races or ethnicities. Defendant directs us to nothing in the record that would undermine the prosecutor's race-neutral explanation.  Rather, he points out that the prosecutor did not exercise peremptory challenges in at least

> three other instances where the prospective juror was employed with children.  However, as the People counter, in each of these instances, the prospective juror was married with one or more older children, circumstances distinguishing these other individuals from Mr. E.
>
> Thus, because the prosecutor's stated reason for excusing Mr. E. was legitimate under the law and adequately supported by the record, we conclude the trial court properly denied defendant's *Batson/Wheeler* motion.

*Robertson*, 2016 WL 3014803, at *6-8.

As the last reasoned decision from a state court, the California Court of Appeal's decision is the decision to which § 2254(d) is applied.  *See Ylst*, 501 U.S. at 803-04; *Barker*, 423 F.3d at 1091-92.  Mr. Robertson is entitled to habeas relief only if the California Court of Appeal's decision was contrary to, or an unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented.

2.   Analysis

The use of peremptory challenges by the prosecution to exclude potential jurors solely on the basis of race[2] is forbidden by the Equal Protection Clause of the Fourteenth Amendment. *Batson*, 476 U.S. at 89.  *Batson* permits prompt rulings on objections to peremptory challenges under a three-step process.  First, the defendant must make out a prima facie case that the prosecutor exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  *Id*. at 94.  If a prima facie case is not found, the challenge may be denied and the court need not proceed any further.  *See United States v. Guerrero*, 595 F.3d 1059, 1062, 1064 (9th Cir. 2010).  Second, if the requisite prima facie showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question.  *Id*. at 97-98.  The explanation need not be "'persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices."

---

[2] *Batson* claims are not limited to race-based peremptory challenges and may be asserted as to peremptory challenges exercised against other identifiable groups such as women or ethnic groups.  Because Mr. Robertson alleges a race-based *Batson* claim, this Court discusses the legal principles in terms of race-based challenges, even though those same principles also apply to peremptory challenges against other identifiable groups.

United States District Court
Northern District of California

1    *Rice v. Collins*, 546 U.S. 333, 338 (2006).  Finally, at the third step, the trial court must determine

2    whether the defendant has carried his burden of proving purposeful discrimination.  *Batson*, 476

3    U.S. at 98.  The "'ultimate burden of persuasion regarding racial motivation rests with, and never

4    shifts from, the opponent of the strike." *Rice*, 546 U.S. at 338.

5            The focus in this case is on the first step of the *Batson* test because the trial judge found no

6    prima face case made and therefore did not proceed to the second and third steps of the *Batson*

7    test.  To make a prima facie case, "the defendant must establish that (1) the prospective  juror who

8    was removed is a member of a cognizable group, (2) the prosecution exercised a peremptory

9    challenge to remove the juror, and (3) 'the facts and any other relevant circumstances raise an

10   inference' that the challenge was motivated by race or gender." *Cooperwood v. Cambra*, 245 F.3d

11   1042, 1045-46 (9th Cir. 2001) (citing *Batson*, 476 U.S. at 96).  As is usually the case, that third

12   factor is the critical one because in all but the rarest cases the first two factors will exist.  Making a

13   prima facie case does not require an "onerous" effort; the defense need only raise an inference and

14   does not need to show that it is "more likely than not" that the peremptory challenge was the

15   product of purposeful discrimination.  *Johnson*, 545 U.S. at 170.  A "prima facie case of

16   discrimination can be made out by offering a wide variety of evidence, so long as the sum of the

17   proffered facts gives 'rise to an inference of discriminatory purpose.'" *Id.* at 169 (quoting *Batson*,

18   476 U.S. at 94).  Some examples of circumstances that a court can consider at step one were

19   mentioned in *Batson*:  "a 'pattern' of strikes against black jurors included in the particular venire

20   might give rise to an inference of discrimination"; and "the prosecutor's questions and statements

21   during voir dire examination and in exercising his challenges may support or refute an inference of

22   discriminatory purpose." *Batson*, 476 U.S. at 97.

23           It was not an unreasonable application of *Batson* and its Supreme Court progeny for the

24   California Court of Appeal to conclude that the trial court had not erred in determining that a

25   prima facie showing had not been made because the evidence was not sufficient to permit the trial

26   judge to draw an inference that discrimination had occurred.

27           Although a pattern of peremptory challenges might make a prima facie case for

28   discrimination, the California Court of Appeal reasonably determined there was no evidence of a

United States District Court
Northern District of California

pattern because Mr. E. was the only African-American who was peremptorily challenged by the

prosecution.  The state appellate court reasonably determined that, as a practical matter, a pattern

rarely could be suggested by the exercise of just one challenge against an African American

prospective juror.  *See, e.g., Fernandez v. Roe*, 286 F.3d 1073, 1078 (9th Cir. 2002) ("[t]wo

challenges out of two [African American] venirepersons are not always enough to establish a

prima facie case" because "the numbers are so small (and, hence, potentially unreliable)");

*Hargrove v. Pliler*, 327 F. App'x 708, 709 (9th Cir. 2009) (rejecting *Batson* claim premised on

step one because it "hinges on a statistical argument involving very small numbers" that, "standing

alone, is insufficient to establish a prima facie case").[3]

   The fact that Mr. E. was peremptorily challenged only after the prosecutor had exercised

eight other peremptory challenges to dismiss non-African American prospective jurors further

undermined the notion that there was a pattern of striking African American prospective jurors.[4]

---

[3] The Court recognizes there is an inherent flaw in the "small numbers" rationale.  The fewer the
numbers of African Americans in the jury, an all-too-common experience that could be the result,
*e.g.*, of structural racial disparities, the more difficult it is to establish the first threshold step of
*Batson*.  The effect is to make an anti-discrimination tool of *Batson* less effective where, if
anything, its need is greater.  The illogic that inheres in that approach to *Batson* warrants
reexamination and reform.

[4] A comparison of Mr. Robertson's case with the cases collected in *Williams v. Runnels*, 432 F.3d
1102, 1107 (9th Cir. 2006), shows the absence of a pattern in Mr. Robertson's case.  In Mr.
Robertson's case, one of nine peremptory challenges was made against an African American
prospective juror.  In *Williams*, the Ninth Circuit found a pattern suggestive of discriminatory
intent when the prosecutor used three of his first four peremptory challenges to remove African
American prospective jurors.

> We have held that a defendant can make a prima facie showing
> based on a statistical disparity alone.  In *Paulino [v. Castro]*, we
> concluded there was an inference of bias where the prosecutor had
> used five out of six peremptory challenges to strike African-
> Americans.  371 F.3d [1083, 1091 (9th Cir. 2004).  In *Fernandez v.
> Ro*e, 286 F.3d 1073, 1077-80 (9th Cir.2002), we found an inference
> of bias where four of seven Hispanics and two African-Americans
> were excused by the prosecutor.  In *Turner v. Marshall*, 63 F.3d
> 807, 812 (9th Cir.1995*), overruled on other grounds by Tolbert v.
> Page*, 182 F.3d 677, 681 (9th Cir.1999) (en banc), we determined
> there was a prima facie showing of discrimination where the
> prosecutor exercised peremptory challenges to exclude five out of a
> possible nine African-Americans.

*Williams*, 432 F.3d at 1107.

1    And the fact that the prosecutor earlier had accepted the jury as composed with Mr. E. on that jury

2    was yet another circumstance suggesting the absence of a pattern of challenging African

3    Americans.  ART 198.  It was only after additional voir dire of other jurors, plus the exercise of

4    additional peremptories by the defense and the court's dismissal of other jurors for cause, that the

5    prosecutor used a peremptory challenge on Mr. E.

6          Next, the California Court of Appeal reasonably decided that the amount of questioning of

7    prospective jurors did not suggest discriminatory purpose.  Differences in questioning can be a

8    circumstance supporting an inference of discriminatory intent.  *See Flowers v. Mississippi*, 139 S.

9    Ct. 2228, 2247 (2019).  The differences may take the form of disproportionately close questioning

10   of prospective jurors of the identified group or asking half-hearted or no questions of members of

11   the identified group as compared to the treatment of others.  *See, e.g., id.* at 2248 (prosecutor used

12   five of his six peremptory challenges to strike African American prospective jurors and had, on

13   average, asked each of the five struck African-American prospective jurors 29 questions, while

14   asking an average of one question of each of the seated white jurors); *United States v. Grandison*,

15   721 F. Supp. 743, 747 (D. Md. 1988) ("desultory or half-hearted questioning" might be prima

16   facie evidence of discriminatory purpose).  Here, the prosecutor did not fail to question Mr. E. or

17   engage in only half-hearted questioning; instead the prosecutor asked direct questions of Mr. E.

18   about his hardship circumstances and his ability to discharge his duties in a race-neutral manner.

19   *See* ART 168-169, 183.  Nor is there any evidence the prosecutor asked a disproportionately high

20   number of questions of Mr. E.  The fact that the prosecutor mentioned race in his questioning also

21   does not suggest a discriminatory intent.  The trial judge and defense counsel earlier also had

22   asked other prospective jurors about race, including those who were not African American.  *See,*

23   *e.g.,* ART 83-86 (judge's questions), 97-102 (defense counsel's questions).  And the prosecutor's

24   questions were not directed at just Mr. Robertson; instead, the prosecutor's initial questions about

25   race were directed at all the prospective jurors in the box and then he asked more targeted

26   questions of Mr. E. only when Mr. E. raised his hand in response to the prosecutor's question as to

27   whether any jurors had concerns about their ability to be fair due to Mr. Robertson's race.  ART

28   168.

United States District Court
Northern District of California

The defense argued that the prosecutor dismissed Mr. E. "soon after" Mr. E. indicated he had concerns similar to other jurors about the issue of race.  ART 322-23.   But the trial court correctly rejected that argument as a misstatement of the record.  The peremptory challenge of Mr. E. was done a day after Mr. E's response to the prosecutor's question about issues of race.  *See* ART 264, 280.

The defense argued that another circumstance showing the prosecutor's discriminatory intent in challenging Mr. E. was the prosecutor's peremptory challenge of Ms. M., who was not African American but was married to an African American and had two children of color.  Docket No. 22-16 at 34. The voir dire record, when viewed as a whole, does not suggest that Ms. M.'s dismissal supports an inference that the prosecutor was acting with a discriminatory purpose, as the California Court of Appeal reasonably determined.  *Robertson*, 2016 WL 3014803, at *7 n.8. Whereas getting most prospective jurors to open up about their thoughts is often a chore (and was so in this case), Ms. M. was a very vocal prospective juror and spoke far more often than any other prospective juror.  *See* ART 52-53, 68-71, 76, 84, 96-100, 166-168.  She also came across as somewhat self-important with her repeated mentions of her close connection to the San Francisco Mayor.  *See, e.g.,* ART 53 (she was a senior advisor to the Mayor and had been elected to the Board of Education), 69 ("through my work in the Mayor's office . . ."), 69 (I oversee park rangers "on behalf of the Mayor"), 96 ("I'm one of [the Mayor's] senior advisors"), 96 ("I have faced the Mayor on a number of different things and so I don't think it will be an issue"), 97 ("I'm not afraid of Mayor Lee.  We have mutual respect for one another").  Two other prospective jurors knew her – one because they worked together and the other because their children went to school together. ART 67.  Ms. M. also voiced strong concerns about the criminal justice system and especially the disproportionately negative impact on people of color; her comments showed she had thought deeply about the matter and had concerns about the societal and institutional problems that also impacted her particular family.  ART 76, 84, 97-100, 166-168.  Defense counsel even observed that "it sounds like you might be prejudiced against [the prosecutor] Mr. Clark; in other words, you would find Mr. Robertson not guilty merely because of the fact that there's prejudice and bias in our society"; Ms. M. disagreed with that statement.  ART 99-100.  Ms. M. affirmed that she

16

United States District Court
Northern District of California

1    could be fair and do her job as a juror.  ART 167-68.   In short, Ms. M. was someone who was

2    acutely aware of systemic and individual racism that led people of color to get shortchanged on

3    justice and other things.  And she was someone whose answers suggested she probably would take

4    the lead in the jury room and have a disproportionate impact on deliberations.  Even defense

5    counsel voiced a concern that Ms. M. might be anti-prosecution based on her statements during

6    voir dire.  Given all this information that suggested Ms. M. would be a juror with very strong

7    opinions and was likely to become a leader on the jury, it was reasonable for the state court to see

8    her dismissal not as evidence of discriminatory purpose, even though she was married to an

9    African American and had two children of color, but instead based on her views potentially

10   unfavorable to the prosecution.

        The state court reasonably could have determined that Ms. M.'s dismissal from the jury

12   was not circumstantial evidence of a discriminatory intent that would help establish a prima facie

13   case for the first step of the *Batson* analysis.

        Finally, it was not an unreasonable application of the *Batson* test for the California Court

15   of Appeal to take into account the prosecutor's statement that he had used peremptory challenges

16   to dismiss most of the prospective jurors who earlier had unsuccessfully requested hardship

17   excuses from jury duty. Consideration of this information at the first step does not show a failure

18   to follow the *Batson* test or a conflation of the first and third steps of the *Batson* test.  *See*

19   *Guerrero*, 595 F.3d at 1063 (district court did not err by taking into account, at first step of *Batson*

20   analysis, the prosecutor's statements regarding the reason for the peremptory challenge as it was

21   part of the totality of circumstances before the court); *see also Paulino*, 371 F.3d at 1092 (when

22   counsel argues that prima facie case is established in part because no race-neutral reasons existed

23   for juror's excusal, court may consider whether "there are such reasons in the record," in which

24   case "it's difficult to say that defendant has raised an inference of bias").

25       Mr. Robertson urged that the prosecutor's supposed reliance on Mr. E's job and childcare

26   duties was "disingenuous" because at least three other persons who were impaneled also had a job

27   and had children.  *See* Docket No. 22-16 at 34.  But those three jurors' children were much older

28   (i.e., one juror had a 17-year old son, another had a 17-year old daughter in college, and a third

17

1   had a 12-year old daughter) and presumably would have posed much less demanding child-care

2   responsibilities than the toddlers Mr. E. had.  *See id.*  at 34 & n.6.

3          Thus, the fact that these persons who had older children were not peremptorily challenged

4   did not raise an inference of discriminatory purpose in the peremptory challenge of Mr. E.  The

5   trial judge had informed prospective jurors that child-care obligations were not a hardship unless

6   they would be required to pay for childcare and could not afford it.  ART 12-13.  Finding someone

7   to take care of a child, especially a child, might have been no small task for jurors who were being

8   selected for what was estimated to be a three to four week trial.  *See* ART 19.  Although a different

9   inference could have been drawn, the state appellate court reasonably could consider the

10  prosecutor's dismissal of jurors who unsuccessfully sought hardship excuses as a neutral non-

11  discriminatory circumstance.

12         The California Court of Appeal's rejection of Mr. Robertson's *Batson* challenge at the first

13  step was not an unreasonable determination of the facts or an unreasonable application of clearly

14  established Supreme Court holdings.  Given the deferential standard of review that applies, he is

15  not entitled to the writ on this claim.

16  B.     Due Process Claim – Exclusion of Evidence

17         Mr. Robertson contends that his right to present a defense was violated by the exclusion of

18  evidence that the victim had suffered two weapons-possession convictions and had appeared on a

19  television program mentioning his desire to buy a knife.[5]

20  _____

21  [5] Three state law evidence rules were implicated by the trial court's rulings concerning the
    exclusion of evidence about the victim (discussed in this section) and the admission of evidence

22  about the defendant (discussed in the next section).

23         California Evidence Code § 352 provides: "The court in its discretion may exclude
    evidence if its probative value is substantially outweighed by the probability that its admission

24  will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice,
    of confusing the issues, or of misleading the jury."

25         California Evidence Code § 1101(a) provides the general rule that evidence of a person's

26  character (such as a prior bad act) is generally inadmissible to prove a defendant's conduct on a
    specified occasion.  Subsection (b) provides several exceptions to that general rule: "Nothing in

27  this section prohibits the admission of evidence that a person committed a crime, civil wrong, or
    other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan,
    knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to

28  commit such an act."  Cal. Evid. Code § 1101(b).

United States District Court
Northern District of California

1        1.        Background

The defense moved in limine to admit evidence that Mr. Minozzi had suffered one

conviction in 2003 for making terrorist threats and two convictions in 2010 for criminal

possession of a weapon (with one of those 2010 cases involving a weapon that consisted of a

sharpened wooden rod).  The defense also sought admission of an excerpt of a 2010 reality-TV

show called "Intervention" in which Mr. Minozzi – then a homeless drug addict – said that, having

recently been released from jail, he wanted to get another knife because his knife had been taken

away.  CT 116.

The trial court ruled that the evidence of the 2003 conviction for terrorist threats would be

admissible, but the other evidence would not be admitted.  The trial court ruled that the weapons-

possession convictions were not relevant and were misleading, given that there was no evidence

that Mr. Minozzi had a knife when Mr. Robertson stabbed him.  RT 758-61.  The trial court

excluded Mr. Minozzi's statement in the reality-TV show, concluding that the statement was

"confusing" and "misleading" because there was no evidence the victim had a weapon when he

was stabbed.  RT 730-33, 758.

On appeal, the California Court of Appeal rejected Mr. Robertson's state law and federal

constitutional challenges to these evidentiary rulings.  The state appellate court primarily

discussed the state law issues; specifically, the admission of evidence under California Evidence

Code section 1103(a) of the victim's character for violence to prove the reasonableness of the

purported fear of a defendant claiming he acted in self-defense and the trial court's duty under

California Evidence Code section 352 to weigh the probative value of such evidence against other

considerations, such as confusion of the jury and undue consumption of time.  The state appellate

court was dubious that the knife evidence was relevant under the recognized principle that "the

---

California Evidence Code § 1103 provides:  "In a criminal action, evidence of the
defendant's character for violence or trait of character for violence (in the form of an opinion,
evidence of reputation, or evidence of specific instances of conduct) is not made inadmissible by
Section 1101 if the evidence is offered by the prosecution to prove conduct of the defendant in
conformity with the character or trait of character and is offered after evidence that the victim had
a character for violence or a trait of character tending to show violence has been adduced by the
defendant under paragraph (1) of subdivision (a)."

*known reputation* of an assailant as to violence, even if specific acts are not with the knowledge of a person assaulted, has a material bearing on the degree and nature of apprehension of danger on the part of the person assaulted.'" *Robertson*, 2016 WL 3014803, at *9 (citation omitted).  Here, there was "no basis for finding (and defendant does not claim) that at the time of the stabbing, he knew about the victim's reputation for violence, much less that the victim had prior convictions for misdemeanor weapon possession." *Id.*  There also was "no evidence" that the "victim possessed a weapon at any time prior to or during the stabbing":  Mr. Robertson acknowledged he did not see the victim in possession of a knife or other weapon, the surveillance video that captured the stabbing showed no knife or other weapon, and no knife or other weapon was recovered from the victim's body or the scene of his death.  *Id.*  The appellate court rejected as "mere speculation" the defense suggestion that a third party who was seen emptying the victim's pockets had taken a knife from the victim.  *Id.*  Lastly, "the proffered evidence at most supports an inference that the victim had a habit of carrying a knife" that did not, "without more, prove the victim was actually a violent person, such that an inference could be made that he was likely to have threatened violence toward defendant in the minutes leading up to the stabbing."  *Id.*  The state appellate court also noted that other evidence was admitted that might have suggested the victim's propensity for violence – e.g., his conviction for "terrorist threats" and evidence of his "loud and aggressive verbal altercation with his girlfriend on Market Street just an hour before his death."  *Id.*  Given all these circumstances, the state appellate court concluded that the "trial court could have reasonably found the minimally-probative evidence that the victim had been convicted twice in the recent past of weapon possession would have consumed an undue amount of time, while possibly distracting and confusing jurors" and properly excluded the evidence under California Evidence Code section 352.  *Id.* at *10.

    The California Court of Appeal also rejected Mr. Robertson's argument that the exclusion of the evidence violated his constitutional right to present a defense.  *Id.* at *10.

> [W]hile defendant may be correct that his subjective belief in the need for self defense was the issue at the heart of his case, the law is quite clear that "this does not mean the trial court constitutionally was compelled to permit [him] to introduce all possibly relevant evidence on these subjects despite its marginal relevance, the

United States District Court
Northern District of California

> possible effect upon the jury's ability to remain focused on the issues before it (rather than becoming sidetracked on collateral questions), and the potentially significant amount of time entailed in admitting the evidence in a manner fair to both sides. (See *People v. Cornwell* (2005) 37 Cal.4th 50, 82 [33 Cal.Rptr.3d 1, 117 P.3d 622] ['a state court's application of ordinary rules of evidence—including the rule stated in Evidence Code section 352—generally does not infringe upon' the constitutional right to offer a defense]....)"
> (*People v. Fuiava* (2012) 53 Cal.4th 622, 665–666.)
>
> Accordingly, we conclude that exclusion of the challenged evidence relating to the victim's violent character was within the proper scope of the trial court's broad discretion under Evidence Code section 352, and resulted in no infringement on defendant's right to present a complete defense.

*Robertson*, 2016 WL 3014803, at *10.

As the last reasoned decision from a state court, the California Court of Appeal's decision is the decision to which § 2254(d) is applied. *See Ylst*, 501 U.S. at 803-04; *Barker*, 423 F.3d at 1091-92. Mr. Robertson is entitled to habeas relief only if the California Court of Appeal's decision was contrary to, or an unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented.

### 2. Analysis of Constitutional Claim

The U.S. Constitution gives a criminal defendant the right to present a defense. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted). The Compulsory Process Clause of the Sixth Amendment preserves the right of a defendant in a criminal trial to have compulsory process for obtaining a favorable witness. *Washington v. Texas*, 388 U.S. 14, 19 (1967). The Sixth Amendment right to present relevant testimony "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973); *Taylor v. Illinois*, 484 U.S. 400, 410-11 (1988) (right to compulsory process is not absolute). A defendant "'does not have an unfettered right to offer [evidence] that is incompetent, privileged or otherwise inadmissible under standard rules of evidence.'" *Montana v. Egelhoff*, 518

U.S. 37, 42-43 (1996) (plurality opinion) (alteration in original) (quoting *Taylor*, 484 U.S. at 410).

Even relevant evidence may be excluded on account of certain evidentiary rules. *See id.* at 42.

"[T]o say that the right to introduce relevant evidence is not absolute is not to say that the Due

Process Clause places *no* limits upon restriction of that right"; rather, it means that the defendant

has the heavy burden to show that the decision to exclude evidence "'offends some principle of

justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"

*Id.* at 42-43 (citation omitted).  Even if the exclusion of evidence was a constitutional error, habeas

relief is not available unless the erroneous exclusion had a "'substantial and injurious effect or

influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

"Only rarely [has the Supreme Court] held that the right to present a complete defense was

violated by the exclusion of defense evidence under a state rule of evidence."  *Nevada v. Jackson*,

569 U.S. 505, 509 (2013).[6]  In *Jackson*, the Supreme Court identified four cases where it had

found such a violation:  *Holmes v. South Carolina*, 547 U.S. 319 (2006); *Rock v. Arkansas*, 483

U.S. 44 (1987); *Chambers v. Mississippi*, 410 U.S. 284 (1973); and *Washington v. Texas*, 388 U.S.

14 (1967).

In *Holmes v. South Carolina*, 547 U.S. 319, the Supreme Court held that a criminal

defendant's right to present a defense was violated by an evidence rule under which a defendant

could not introduce proof of third-party guilt if the prosecution had introduced forensic evidence

that, if believed, would strongly support a guilty verdict.  The constitutional problem was that the

general rule (i.e., allowing a defendant to offer evidence of third-party guilt if the evidence was

inconsistent with his own guilt and was not speculative) had been "radically" changed by the

South Carolina Supreme Court to be contingent on the strength of the prosecution's case.  *Id.* at

---

[6] In *Nevada v. Jackson*, the Supreme Court reversed the Ninth Circuit's decision granting habeas relief for a petitioner who had been barred from presenting extrinsic evidence of the victim's prior accusations of sexual assault at petitioner's trial for rape.  The Ninth Circuit was faulted for viewing the Supreme Court's cases on the right to present a defense at too high a level of generality.  *See* 569 U.S. at 512.  Although the Supreme Court had held that certain restrictions on a defendant's ability to cross-examine a witness violate the Confrontation Clause, the Supreme Court "has never held that the Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes."  *Id.*  "The Ninth Circuit elided the distinction between cross-examination and extrinsic evidence by characterizing the cases as recognizing a broad right to present 'evidence bearing on [a witness'] credibility.'"  *Id.* (alteration in original).

United States District Court
Northern District of California

328.  As a result of the state court's radical change in the rule, the rule ceased to rationally serve the end that the general rule was "designed to promote, i.e., to focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues."  *Id.* at 330.

In *Rock v. Arkansas*, 483 U.S. 44, the Supreme Court held that Arkansas' *per se* rule excluding all hypnotically enhanced testimony was unconstitutional when used to restrict a defendant's right to testify.  There, the Court explained that "[a] State's legitimate interest in barring unreliable evidence does not extend to *per se* exclusions that may be reliable in an individual case. Wholesale inadmissibility of a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all posthypnosis recollections."  *Id.* at 61.

In *Chambers v. Mississippi*, 410 U.S. 284, the Supreme Court held that the defendant was denied a fair trial when the state's evidentiary rules prevented him from calling witnesses who would have testified that another witness made trustworthy, inculpatory statements on the night of the crime.  It was the combination of the rigid application of the State's evidence rules and the fact that the proffered evidence bore considerable assurances of trustworthiness and reliability that led to the due process violation in *Chambers*.  *See id.* at 302-03.  The Supreme Court specifically pointed out that its holding did not "signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures."  *Id.*

The challenged rule in *Washington v. Texas,* 388 U.S. at 15, provided that principals, accomplices and accessories in the same crime could not be used as witnesses for each other.  This rule violated a defendant's right to compulsory process because "the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense."  *Id.* at 23.

The rules in those cases were sweeping and cut to the heart of the defendant's ability to present a legitimate defense.  None involved the circumstances presented in Mr. Robertson's case:

the particularized application of a facially valid rule of evidence to limit evidence which had little or no probative value. It is debatable whether the above-mentioned Supreme Court precedents could support a finding of a violation of the constitutional right to present a defense based on a routine application of an otherwise permissible rule. Thus far, "the Supreme Court's cases have focused only on whether an evidentiary rule, by its own terms, violated a defendant's right to present evidence." *Id.* at 758. Because "fairminded jurists could disagree" on whether the right-to-present-a-defense cases extend to the routine application of an otherwise permissible rule, such as California Evidence Code section 352, the California Court of Appeal's rejection of the claim does not support relief under § 2254(d). *See Harrington v. Richter*, 562 U.S. at 101; *see also id.* at 103 (petitioner must show the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement").

Mr. Robertson does not identify any Supreme Court holding to the effect that an evidence rule (like California Evidence Code section 352) which allows the exclusion of evidence when its probative value is outweighed by issue confusion or undue time-consumption violates the constitutional rights to present a defense or due process.[7] Mr. Robertson also fails to show that the rule allowing exclusion of evidence where the probative value is outweighed by a prejudicial effect -- "offends some 'fundamental principle of justice'" such that the rule itself violates a criminal defendant's right to due process. *See Montana v. Egelhoff*, 518 U.S. at 43. To the contrary, "the Supreme Court has indicated its approval of 'well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other

---

[7] California Evidence Code section 352, like its federal analog, Federal Rule of Evidence 403, is a rather commonplace kind of evidentiary rule allowing the exclusion of evidence where its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time, be unduly prejudicial, confuse the issues or mislead the jury. Section 352 itself does not offend due process or the right to present a defense. *Cf. Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) ("trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant"); *Montana v Egelhoff*, 518 U.S. at 42 (citing Federal Rule of Evidence 403 as an example of "familiar and unquestionably constitutional evidentiary rule[s]" that "authorize the exclusion of relevant evidence.")

United States District Court
Northern District of California

factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.'" *Moses v. Payne*, 555 F.3d 742, 757 (9th Cir. 2009) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006)).

Even assuming *arguendo* that the right to present a defense could be violated by the state court's application of a rule that did not itself violate a constitutional right, Mr. Robertson still would not be entitled to relief because the state court's application of the rule was not unreasonable. The California Court of Appeal reasonably determined that Mr. Robertson had not shown an evidentiary basis for the admission of the evidence because there was no evidence showing that Mr. Robertson was aware of Mr. Minozzi's prior convictions for possession of a weapon or his desire to acquire a knife two years before the stabbing and there was no evidence that Mr. Minozzi actually possessed any weapon when Mr. Robertson stabbed him. Thus, the proffered evidence did not actually corroborate Mr. Robertson's testimony that he was in fear for his life when he stabbed Mr. Minozzi. The state appellate court's decision to uphold the exclusion of the evidence under California Evidence Code section 352 also was not an unreasonable application of clearly established federal law from the U.S. Supreme Court, given the court's assessment that the evidence had low probative value and presented a likelihood that its admission would mislead and confuse the jury.

Mr. Robertson is not entitled to habeas relief on his right-to-present-a-defense claim because the state appellate court's rejection of the claim that Mr. Robertson's right to present a defense was violated by the evidentiary ruling was not contrary to or an unreasonable application of clearly established federal law on the constitutional right to present a defense.

C.    Due Process Claim – Admission of Evidence

Mr. Robertson next contends that his right to due process was violated by the admission of evidence that he was a pimp, that D.J. was a prostitute, and that he had hit D.J. several times. He contends that the evidence was irrelevant and, even if relevant, the probative value of the evidence was greatly outweighed by the prejudicial impact.

1.    Background

The trial court denied Mr. Robertson's request, made pursuant to California Evidence

25

1    Code section 352, to exclude evidence that he was a pimp, that D.J. – who disposed of evidence

2    for him and went to Georgia with him after the stabbing – was a prostitute, and that he had hit her

3    on several occasions.  The trial court excluded the evidence from the prosecution's case-in-chief

4    but ruled that it would be admissible under the following circumstances:  (1) the evidence could be

5    admitted as impeachment evidence if Mr. Robertson testified, (2) the evidence could be admitted

6    if Mr. Robertson attacked D.J.'s credibility as a prostitute, or (3) the evidence could be admitted if

7    Mr. Robertson introduced evidence to impugn the victim's character.  RT 255.

8         The California Court of Appeal rejected Mr. Robertson's claims that the admission of the

9    evidence violated state law and Mr. Robertson's federal constitutional right to due process.  The

10   state appellate court discussed only the state law claim, and concluded that the admission of the

11   evidence "was a proper exercise of discretion."  *Robertson*, 2016 WL 3014803, at *11.

12              Specifically, defendant testified at length about the victim's
                allegedly threatening behavior towards him, which, he claimed, let
13              [sic] him to believe it was necessary to stab the victim in self
                defense.  In addition, defendant offered evidence of the victim's
14              own prior bad acts, including the victim's conviction in New York
                for making "terroristic threats" and his verbal altercation with his
15              girlfriend just an hour before the stabbing that required police
                intervention.  Under these circumstances, the trial court could have
16              reasonably found that the evidence of defendant's prior uncharged
                acts (to wit, pimping and domestic violence) was relevant to
17              impeach his testimony that he innocently followed the victim into
                the alleyway in the hopes of resolving whatever problems had arisen
18              between them, and only resorted to violence when he believed it was
                necessary to protect his own life, and that such evidence would not
19              be unduly prejudicial.  (See *People v. Karis* (1988) 46 Cal.3d 612,
                638 ["'The "prejudice" referred to in Evidence Code section 352
20              applies to evidence which uniquely tends to evoke an emotional bias
                against the defendant as an individual and which has very little
21              effect on the issues.  In applying section 352, "prejudicial" is not
                synonymous with "damaging"'"].)  As stated in a well-known
22              legal treatise: "Past criminal conduct involving moral turpitude that has
                some logical bearing on the veracity of a witness in a criminal
23              proceeding is admissible to impeach the witness, subject to the trial
                court's discretion under [Evidence Code section 352]."  (3 Witkin,
24              Cal. Evid. (5th ed. 2012) Presentation § 326, p. 459, citing *People v.*
                *Wheeler* (1992) 4 Cal.4th 284, 288, 295.)

25

26   *Robertson*, 2016 WL 3014803, at *11.  The California Court of Appeal also concluded that any

27   state law error was harmless given the other evidence at trial.  *Id.*

28         As mentioned, the state appellate court did not discuss the federal due process claim that

had been presented based on the admission of the evidence.  Because the California Court of Appeal denied the federal constitutional claim without explanation, this Court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Harrington*, 562 U.S. at 102.

### 2.   Analysis of Federal Due Process Claim

To violate due process, the allegedly wrongful admission of evidence must be "so extremely unfair that its admission violates 'fundamental conceptions of justice.'" *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)); *see, e.g., id.* (due process was not violated by admission of evidence to identify perpetrator and link him to another perpetrator even though the evidence also was related to crime of which defendant had been acquitted); *Gimenez v. Ochoa*, 821 F.3d 1136, 1145 (9th Cir. 2016) (petitioner who showed that a vigorous debate had sprung up as to the validity of the "triad-only" theory of shaken baby syndrome in the years since his murder conviction "failed to show that permitting the prosecution's experts to testify based on a triad-only theory of [shaken baby syndrome] was 'so extremely unfair that it[] . . . violate[d] fundamental conceptions of justice.'") (alterations and omission in original).

The United States Supreme Court has never held that the introduction of propensity or other allegedly prejudicial evidence violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 68-70 (1991).  *Estelle v. McGuire* specifically left open the question regarding propensity evidence.  *See id.* at 75 n.5 ("we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime").

In *Estelle v. McGuire*, the defendant was on trial for murder of his infant daughter after she was brought to a hospital and died from numerous injuries suggestive of recent child abuse.  The defendant told police the injuries were accidental.  Evidence was admitted at trial that the coroner discovered during the autopsy older, partially healed, injuries that had occurred six or seven weeks

before the child's death.  *Id.* at 65.  Evidence of the older injuries was introduced to prove

"battered child syndrome," which "exists when a child has sustained repeated and/or serious

injuries by nonaccidental means."  *Id.* at 66.  The state appellate court had held that the proof of

prior injuries tending to establish battered child syndrome was proper under California law.  *Id.*  In

federal habeas proceedings, the Ninth Circuit found a due process violation based in part on its

determination that the evidence was improperly admitted under state law.  *Id.* at 66-67.  The U.S.

Supreme Court first held that the Ninth Circuit had erred in inquiring whether the evidence was

properly admitted under state law because "'federal habeas corpus relief does not lie for errors of

state law.'"  *Id.* at 67.  The Supreme Court then explained:

> The evidence of battered child syndrome was relevant to show
> intent, and nothing in the Due Process Clause of the Fourteenth
> Amendment requires the State to refrain from introducing relevant
> evidence simply because the defense chooses not to contest the
> point.  [¶]  Concluding, as we do, that the prior injury evidence was
> relevant to an issue in the case, we need not explore further the
> apparent assumption of the Court of Appeals that it is a violation of
> the due process guaranteed by the Fourteenth Amendment for
> evidence that is not relevant to be received in a criminal trial.  We
> hold that McGuire's due process rights were not violated by the
> admission of the evidence.  *See Spencer v. Texas*, 385 U.S. 554,
> 563–564, 87 S. Ct. 648, 653–654, 17 L.Ed.2d 606 (1967) ("Cases in
> this Court have long proceeded on the premise that the Due Process
> Clause guarantees the fundamental elements of fairness in a criminal
> trial. . . .  But it has never been thought that such cases establish this
> Court as a rulemaking organ for the promulgation of state rules of
> criminal procedure").

*Estelle v. McGuire*, 502 U.S. at 70 (omission in original).

The cited case, *Spencer v. Texas*, 385 U.S. at 563, held that the admission of evidence of

prior convictions did not violate due process.  The Supreme Court explained in *Spencer* that,

although there may have been other, perhaps better, ways to adjudicate the existence of prior

convictions (e.g., a separate trial on the priors after the trial on the current substantive offense

resulted in a guilty verdict), Texas' use of prior crimes evidence in a "one-stage recidivist trial"

did not violate due process.  *Id.* at 563-64.  "In the face of the legitimate state purpose and the

long-standing and widespread use that attend the procedure under attack here, we find it

impossible to say that because of the possibility of some collateral prejudice the Texas procedure

is rendered unconstitutional under the Due Process Clause as it has been interpreted and applied in

our past cases." *Id.* at 564.

Estelle v. McGuire* also cited to *Lisenba v. California*, 314 U.S. 219, 228 (1941), in support of the conclusion that the introduction of the battered child syndrome evidence did not so infuse the trial with unfairness as to deny due process of law.  *See Estelle v. McGuire*, 502 U.S. at 75.  In *Lisenba*, the Supreme Court rejected a claim that the admission of inflammatory evidence violated the defendant's due process rights.  The evidence at issue in *Lisenba* was live rattlesnakes and testimony about them to show they had been used by the defendant to murder his wife.  "We do not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence.  We cannot hold, as petitioner urges, that the introduction and identification of the snakes so infused the trial with unfairness as to deny due process of law.  The fact that evidence admitted as relevant by a court is shocking to the sensibilities of those in the courtroom cannot, for that reason alone, render its reception a violation of due process."  *Lisenba*, 314 U.S. at 228-29.

These three Supreme Court cases declined to hold that the admission of prejudicial or propensity evidence violates the defendant's due process rights.  No Supreme Court cases since *Estelle v. McGuire* have undermined the holdings in these three cases.  In other words, there is no Supreme Court holding that the admission of prejudicial or propensity evidence violates due process.

When the U.S. Supreme Court "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, 'it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.'  Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized."  *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (alterations in original) (citation omitted) (quoting *Carey v. Musladin*, 549 U.S. 70, 77 (2006), and 28 U.S.C. § 2254(d)(1)).

Indeed, the Ninth Circuit has recognized that the United States Supreme Court has never held that the introduction of propensity or other allegedly prejudicial evidence violates due process.  In *Foy v. Gipson*, 609 F. App'x 903 (9th Cir. 2015), the court, in an unpublished memorandum, denied habeas relief on claim that admission of propensity evidence (i.e., that defendant assaulted another woman after he assaulted victim in this case) violated defendant's

United States District Court
Northern District of California

right to due process, because *Estelle v. McGuire's* reservation of the question as to whether propensity evidence violates due process "forecloses the conclusion that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law.  *See Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (denying habeas relief upon finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Federal law under § 2254(d)); *Alberni v. McDaniel*, 458 F.3d 860, 865 (9th Cir. 2006) (denying habeas relief on claim that due process was violated by admission of evidence of defendant's past violent actions and explosive temper to show propensity due to *Estelle v. McGuire's* reservation of the question whether propensity evidence violates due process).

"[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  Bearing in mind the extremely general nature of the Supreme Court's articulation of a principle of "fundamental fairness" – i.e., evidence that "is so extremely unfair that its admission violates 'fundamental conceptions of justice'" may violate due process, *Dowling*, 493 U.S. at 352 – the California Court of Appeal's rejection of Mr. Robertson's due process claim was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the Supreme Court.  *See generally Holley*, 568 F.3d at 1101 (denying writ because, although Supreme Court "has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ") (citation omitted)).

In this circuit, the admission of prejudicial evidence may make a trial fundamentally unfair and violate due process "[o]nly if there are *no* permissible inferences the jury may draw from the evidence."  *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (emphasis in original).  "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions.

1   Only if there are *no* permissible inferences the jury may draw from the evidence can its admission

2   violate due process.  Even then, the evidence must 'be of such quality as necessarily prevents a

3   fair trial.'  Only under such circumstances can it be inferred that the jury must have used the

4   evidence for an improper purpose." *Jammal*, 926 F.2d at 920 (citation and footnote omitted).[8]

5              Here, the evidence that Mr. Robertson was a pimp, D.J. was his prostitute, and he engaged

6   in domestic violence against her was relevant to impeach Mr. Robertson's credibility.  Under

7   California law, a witness' past criminal conduct involving moral turpitude has a logical bearing on

8   the veracity of the witness and thus may be admitted to impeach that witness.  *See People v.*

9   *Wheeler*, 4 Cal. 4th 284, 295 (Cal. 1992); *see also People v. Castro*, 38 Cal. 3d 301, 315 (Cal.

10  1985) ("it is undeniable that a witness' moral depravity of any kind has some 'tendency in reason'

11  (Evid. Code § 210) to shake one's confidence in his honesty").  Both pimping and domestic

12  violence are crimes of moral turpitude.  *See People v. Jaimez*, 184 Cal. App. 3d 146, 150 (Cal. Ct.

13  App. 1986) (pimping); *People v. Rodriguez*, 5 Cal. App. 4th 1398, 1402 (Cal. Ct. App. 1992)

14  (domestic violence).  Thus, from the evidence that Mr. Robertson engaged in crimes of moral

15  turpitude (i.e., pimping and engaging in acts of domestic violence against D.J.), the jury could

16

17  _____

17  [8] In *Jammal*, the police found a gun, $47,000 and drugs in the trunk of Jammal's stolen car when

18  they arrested Willis, who had stolen Jammal's car; 18 months later, the police found $135,000 (but
    no drugs) in the trunk of Jammal's car when they arrested Jammal.  At trial, Willis said he had no

19  idea the drugs and money were in the trunk of Jammal's stolen car until police opened it.  The
    prosecution urged the jury to infer that both the drugs and the $47,000 found in the trunk of

20  Jammal's car when Willis was arrested belonged to Jammal since Jammal later was arrested also
    with a large stash of cash in his trunk.  Jammal unsuccessfully objected that this evidence

21  effectively branded him a drug dealer and was therefore inadmissible character evidence. The
    Ninth Circuit explained that state law evidence rules were beside the point in a federal habeas

22  proceeding and any problem in the jury inferring that Jammal had put the $47,000 and drugs in the
    car earlier (even if impermissible under state law) was not a constitutional problem because the

23  inference that Jammal had put both the $47,000 and drugs in the trunk on an earlier occasion was a
    "rational inference" the jury could draw from the evidence that he was caught with $135,000 in his

24  trunk.  *Jammal*, 926 F.2d at 920.

25          *Jammal* is one of the few cases that provides any guidance as to what might amount to the
    introduction of evidence that might amount to fundamental unfairness.  The Ninth Circuit

26  continues to use the *Jammal* "permissible inference" test in habeas cases governed by AEDPA.
    *See, e.g., Noel v. Lewis*, 605 F. App'x 606, 608 (9th Cir. 2015) (admission of gang evidence did

27  not violate due process); *Lundin v. Kernan*, 583 F. App'x 686, 687 (9th Cir. 2014) (citing *Jammal*
    and concluding that admission of graffiti evidence did not violate due process because there were

28  permissible inferences to be drawn); *Gonzalez v. Knowles*, 515 F.3d 1006, 1011 (9th Cir. 2008)
    (citing *Jammal* and concluding that evidence of prior bad acts did not violate due process).

United States District Court
Northern District of California

1    infer that he was not truthful in his testimony, including his testimony that he stabbed Mr. Minozzi

2    because he thought Mr. Minozzi was reaching for a weapon.

3            In sum, the challenged evidence allowed an inference that Mr. Robertson was not a

4    credible witness.  Because the inference was permissible, the state appellate court did not

5    unreasonably apply Supreme Court precedent in holding that the admission of the evidence did not

6    violate due process.  Mr. Robertson is not entitled the writ on this claim.

7    D.      Prosecutorial Misconduct Claim

8            Mr. Robertson next contends that the prosecutor engaged in misconduct with three specific

9    comments he made during closing argument.  First, Mr. Robertson contends that the prosecutor

10   misstated the law when he argued that the presumption of innocence ended before the trial ended.

11   Second, Mr. Robertson contends that the prosecutor misstated the law when he stated that

12   destruction of evidence was direct, rather than circumstantial, proof of guilt.  Finally, Mr.

13   Robertson contends that the prosecutor misstated the facts when he said that Mr. Robertson beat

14   D.J. when she failed to earn enough as a prostitute when there was no evidence that her

15   prostitution deficiency was the reason Mr. Robertson admittedly hit her.  The alleged

16   misstatements will be examined separately.

17           1.      Comment Regarding Presumption of Innocence

18                   a.      Background

19   In his closing argument, the prosecutor discussed the evidence at length and then stated:

20           So that's the evidence.  That gives you the ability to determine the
             facts in this case.  And that's coming from the prosecution.  That's
21           coming from the prosecution.  I did talk about Mr. Robertson but
             those are prosecution's witnesses because the prosecution has the
22           burden of proof.  The defense doesn't have any obligation at all.

23           So it wasn't until that evidence is all presented to you that you
             actually have evidence upon which to determine the facts that a
24           crime was committed. . . .

25           And until you have evidence, Mr. Robertson was presumed
             innocent. *He was presumed innocent until you have evidence to the*
26           *contrary*.

27           *Well, now you have evidence to the contrary*. And there's no self-
             defense. This guy's pursuing him and killing him.
28

RT 893 (emphasis added).

Mr. Robertson contends that the italicized portion of this statement was prosecutorial misconduct because it misstated the operation of the presumption of innocence.

The California Court of Appeal rejected Mr. Robertson's state law and federal due process claims of prosecutorial misconduct. The state appellate court initially set out the legal standards:

> The law governing defendant's prosecutorial misconduct claims is not in dispute. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*). See also *People v. Samayoa* (1997) 15 Cal.4th 795, 841 [federal Constitution violated where prosecutorial misconduct is "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process"].) Under these standards, "'"a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]' ... 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness'" [citation], and he may "use appropriate epithets...."'" [Citation.] [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 819, disapproved on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) When the alleged prosecutorial misconduct stems from the prosecutor's remarks or comments made before the jury, "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Morales, supra*, 25 Cal.4th at p. 44.)

*Robertson*, 2016 WL 3014803, at *12.

The California Court of Appeal agreed that "the presumption of innocence is a core component of our criminal justice" that continued through trial, "during the deliberations of the jury and until they reach a verdict," but disagreed that the prosecutor's comment had undermined the presumption. *Id.*

> Rather, the prosecutor's argument that, in effect, the "presumption of innocence" had ended because "you have evidence to the contrary" was made in the course of the prosecutor's broader argument that the evidence, considered as a whole, sufficed to prove defendant's guilt beyond a reasonable doubt. The prosecutor also made clear, to be sure, that "everything that I say, as we've heard a million times, is not evidence. It's what the witnesses and

documents and videos show that is the evidence."  He also reminded
that each juror had a duty to apply the law as provided by the trial
court.  Thus, the prosecutor's comments, viewed as a whole, did not
misstate the law.  Rather, they reflected the prosecution's views as
to what the evidence established. . . . [¶]  Moreover, consistent with
the prosecutor's overall argument, the trial court clearly instructed
the jury that defendant, like all criminal defendants, must be
presumed innocent unless or until the prosecution proves him guilty
beyond a reasonable doubt, and that nothing the attorneys say is
evidence.  We, as always, presume the jury followed these
instructions.

*Id.*

As the last reasoned decision from a state court, the California Court of Appeal's decision

is the decision to which § 2254(d) is applied.  *See Ylst*, 501 U.S. at 803-04; *Barker*, 423 F.3d at

1091-92.  Mr. Robertson is entitled to habeas relief only if the California Court of Appeal's

decision was contrary to, or an unreasonable application of, clearly established federal law from

the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the

evidence presented.

### b.     Analysis of Federal Constitutional Claim

The appropriate standard of review for a prosecutorial-misconduct claim in a federal

habeas corpus action is the narrow one of due process and not the broad exercise of supervisory

power.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("it 'is not enough that the prosecutors'

remarks were undesirable or even universally condemned'"); *Smith v. Phillips*, 455 U.S. 209, 219

(1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the

fairness of the trial, not the culpability of the prosecutor").  The inquiry is whether the

"prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a

denial of due process.'"  *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S.

637, 643 (1974)).  The "*Darden* standard is a very general one, leaving courts 'more leeway . . . in

reaching outcomes in case-by-case determinations.'"  *Parker v. Matthews*, 567 U.S. 37, 48 (2012)

(omission in original) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

### i.     The Legal Standard Was Not Misstated

At first glance, one might question whether the California Court of Appeal correctly

articulated the federal standard of review, given that the court took into account the prosecutor's

34

1    mindset.  For example, the California Court of Appeal identified a test as whether the prosecutor

2    used "deceptive or reprehensible methods to attempt to persuade" and found a misstatement about

3    direct and circumstantial evidence to be made "in good faith."  *Robertson*, 2016 WL 3014803, at

4    *12-13.

5        Focusing on the blameworthiness of the prosecutor would, of course, be inconsistent with

6    Supreme Court cases that have made clear that "the touchstone of due process analysis in cases of

7    alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."

8    *Smith*, 455 U.S. at 219.  In other words, in the federal due process analysis, a court does not

9    concern itself with whether a prosecutor's misstep was innocent or malicious and instead looks at

10   how that misstep affected the trial.  *See, e.g., id.* at 219 & n.10 (due process analysis focuses on

11   the effect on the trial rather than the prosecutor's motives even in cases involving knowing use of

12   perjured testimony and suppression of evidence).

13       This Court concludes that the California Court of Appeal did not articulate an incorrect

14   legal standard.  Rather, the California Court of Appeal described the federal standard and then

15   described the state standard, but did not conflate the two standards.  The state appellate court

16   wrote:  "'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution

17   when it infects the trial with such unfairness as to make the conviction a denial of due process.

18   Conduct by a prosecutor *that does not render a criminal trial fundamentally unfair* is prosecutorial

19   misconduct *under state law* only if it involves the use of deceptive or reprehensible methods to

20   attempt to persuade either the trial court or the jury.'"  *Robertson*, 2016 WL 3014803, at *12

21   (emphasis added).   That second quoted sentence shows the California Court of Appeal contrasting

22   the federal standard with the state standard: conduct that does not meet the federal standard – i.e.,

23   because it "does not render a criminal trial fundamentally unfair" – meets the state-law standard

24   for prosecutorial misconduct only if it involves the "use of deceptive or reprehensible methods."

25   This Court thus concludes that the California Court of Appeal did not misunderstand the legal

26   standard for the federal constitutional claim presented to it.

27              ii.     *Ford v. Peery*

28       The Ninth Circuit recently considered a comment that was very similar to the one made in

United States District Court
Northern District of California

35

Mr. Robertson's case and concluded that there was prosecutorial misconduct that warranted federal habeas relief.  *See Ford v. Peery*, 976 F.3d 1032, 1035 (9th Cir. 2020).   In *Ford*, at the end of his rebuttal argument, the prosecutor urged:  "'This idea of this presumption of innocence is over.  Mr. Ford had a fair trial.  We were here for three weeks where . . . he gets to cross-examine witnesses; also an opportunity to present evidence information through his lawyer.  He had a fair trial. This system is not perfect, but he had a fair opportunity and a fair trial.  He's not presumed innocent anymore.'"  *Id.*  The defense attorney in *Ford* objected that the prosecutor had misstated the law; the court overruled the objection; and the prosecutor resumed, "'And so we're past that point.'"  *Id.*

On direct appeal in Ford's case, the California Court of Appeal had declined to reach the question whether the prosecutor had misstated the law (because California courts were split on whether it actually was an incorrect statement of the law to say that the presumption was over once sufficient evidence of guilt had been presented) and held that any error was harmless.  *See id.* at 1040-41.  The Ninth Circuit reviewed the claim de novo after concluding that there was no state-court decision to which the federal court could defer as to whether there was a misstatement of federal law and whether such a misstatement violated due process under *Darden*.  *Id.* at 1041-42.

The Ninth Circuit determined that the prosecutor's statements in *Ford* that the "presumption of innocence is over," and defendant "is not presumed innocent anymore" misstated federal law.  *Id.* at 1042.  Relying on earlier Ninth Circuit cases, the *Ford* court stated that misconduct, such as a misstatement of law, "rises to the level of *Darden* error only if there is a reasonable probability that it rendered the trial fundamentally unfair."  *Id.* at 1042 (citing *Deck v. Jenkins*, 814 F.3d 954, 958 (9th Cir. 2016)).  The *Ford* court also identified the following factors considered by the Supreme Court in *Darden* to determine whether improper prosecutorial statements rise to the level of a due process violation:

> The *Darden* factors—i.e., the weight of the evidence, the prominence of the comment in the context of the entire trial, whether the prosecution misstated the evidence, whether the judge instructed the jury to disregard the comment, whether the comment was invited by defense counsel in its summation and whether

> defense counsel had an adequate opportunity to rebut the comment—require courts to place improper argument in the context of the entire trial to evaluate whether its damaging effect was mitigated or aggravated.

*Id.* at 1042 (quoting *Hein v. Sullivan*, 601 F.3d 897, 914 (9th Cir. 2010)).

The *Ford* court then applied these factors to reach its conclusion that there was *Darden* error. The weight of the evidence against Ford "was not great" and instead "was circumstantial, incomplete, and in conflict." *Id.* at 1043. No witness had seen the shooting of the victim as he sat in his car, the witnesses who had seen men on the street before the shooting did not identify Ford, and the physical evidence did not match the prosecution's theory of how the shooting unfolded. *Id.* Moreover, the jury "clearly had trouble with the evidence," announcing a deadlock after four days of deliberation and eventually returning verdicts that were internally inconsistent. *Id.* The prosecutor's misstatement "could hardly have been" more prominent, as his misstatement of the law was made three times at the end of his rebuttal so that it was the last thing the jury heard from the attorneys before beginning deliberations later that day. *Id.* There also was not only no curative instruction, but the trial judge overruled the objection to the misstatement, thereby telling "the jury, in effect, that the presumption of innocence was 'over' before they retired to begin deliberations." *Id.* The written jury instructions "did not tell the jury when the presumption applied and when it was 'over.'" *Id.* Lastly, defense counsel did not invite the misstatement and did not have an adequate opportunity to rebut it because the misstatement was made at the close of rebuttal. *Id.* at 1043-44. Based on all these factors, the Ninth Circuit held that there was a due process violation because "there was a reasonable probability of a different outcome in this thin, circumstantial case had the prosecutor not misstated the law." *Id.* at 1044. The court then determined that there was no need for a separate prejudice analysis because "prejudice is incorporated into the analysis of the due process violation itself" under the standard as the Ninth Circuit had defined it, i.e., there is a due process violation under *Darden* when there was a 'reasonable probability of a different result' absent the prosecutor's misconduct.'" *Ford*, 976 F.3d at 1044 (quoting *Hein*, 601 F.3d at 914-15).

In a sharp dissent, Judge Nelson opined that the prosecutor's statement, viewed in context, "merely emphasized the government had carried its burden of proving Ford's guilt beyond a

1   reasonable doubt" and the majority had ignored Supreme Court precedents regarding the

2   evaluation of a prosecutor's comments.  *Id.* at 1045-51 (Nelson, J., dissenting).  The *Ford* dissent

3   also faulted the majority for "misapply[ying] AEDPA deference" by using the wrong standard of

4   review for the state appellate court's harmless error analysis.  *Id.* at 1051, 1052.

5                                           iii.      <u>Analysis</u>

6            The analysis of Mr. Robertson's habeas claim is governed by *Darden*, "which explained

7   that a prosecutor's improper comments will be held to violate the Constitution only if they "'so

8   infected the trial with unfairness as to make the resulting conviction a denial of due process.'""

9   *Parker v. Matthews,* 567 U.S. at 45 (quoting *Darden*, 477 U.S. at 181).  The "*Darden* standard is a

10  very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case

11  determinations.'"  *Id.* at 48.  Bearing in mind the very general nature of the *Darden* standard, this

12  Court concludes that the California Court of Appeal's rejection of the prosecutorial misconduct

13  claim based on the prosecutor's statement -- that Mr. Robertson was "presumed innocent until you

14  have evidence to the contrary," and now the jury had "evidence to the contrary"  -- was not

15  contrary to or an unreasonable application of that standard.  Although it is a bedrock due process

16  principle that a defendant is presumed innocent until found guilty by the jury, the Supreme Court

17  has never held that it violates due process for a prosecutor to state that the presumption of

18  innocence is over before jury deliberations begin.

19           Even assuming that the prosecutor misstated how the presumption of innocence worked by

20  declaring it finished before deliberations began, it was reasonable for the California Court of

21  Appeal to determine that the comment did not amount to a due process violation when considered

22  in the context of the entire trial.  The comment was part of a broader argument by the prosecutor

23  that the evidence, considered as a whole, proved guilt beyond a reasonable doubt.  *See* RT 870-

24  893 (reviewing evidence that showed guilt and summarizing that prosecution had proven that the

25  crime was committed).  The prosecutor reminded the jury that his statements were not evidence

26  (RT 868, 891-92, 901, 958, 961); repeatedly mentioned that he had the burden to prove guilt

27  beyond a reasonable doubt (RT 869, 893, 898, 904); and at least twice told the jurors that they had

28  to apply the law as instructed by the court (RT 869, 958).  The jury instructions clearly informed

1  the jury that the defendant was presumed innocent unless and until the prosecution proved him

2  guilty.  CT 398 ("A defendant in a criminal case is presumed to be innocent.  This presumption

3  requires the People prove a defendant guilty beyond a reasonable doubt.  Whenever I tell you the

4  People must prove something, I mean they must prove it beyond a reasonable doubt.")  The jury

5  instructions also instructed that nothing the attorneys said was evidence.  CT 395 ("You must

6  follow the law as I explain it to you, even if you disagree with it.  If you believe that the attorneys'

7  comments on the law conflict with my instructions, you must follow my instructions.")

8      The California Court of Appeal did not go through the several *Darden* factors identified in

9  *Ford* and *Hein*, but that cannot be the basis for federal habeas relief because that multi-factorial

10  approach is a creature of circuit law rather than of the *Darden* case itself.  *See Moses v. Payn*e, 555

11  F.3d 742, 760 (9th Cir. 2009) (holding that, where balancing test for excluding evidence is

12  creation of Ninth Circuit law and Supreme Court has not directly considered whether trial court's

13  exercise of discretion to exclude evidence violated defendants' constitutional right to present

14  evidence, state court's failure to use Ninth Circuit's balancing test is not contrary to or an

15  unreasonable application of clearly established Supreme Court precedent).  But even applying

16  those factors on the assumption that the factors identified in *Ford* and *Hein* properly guide a

17  federal habeas court's consideration of a prosecutorial-misconduct claim, this Court concludes that

18  it was not an unreasonable application of *Darden* for the California Court of Appeal to reject the

19  due process claim.

20      First, the evidence against Mr. Robertson was very strong.  He testified that he had stabbed

21  Mr. Minozzi but said he did so because he thought Mr. Minozzi was going to draw a weapon.  The

22  video evidence strongly undermined Mr. Robertson's description of the circumstances

23  surrounding the stabbing.  According to the California Court of Appeal (and undisputed by Mr.

24  Robertson), the video evidence showed that Mr. Robertson had a confrontation with Mr. Minozzi

25  in a store, then followed him for 50 feet into an alley, and then stabbed him after Mr. Minozzi

26  "suddenly turn[ed] and jump[ed] as if pulling up his pants." *Robertson*, 2016 WL 3014803, at *2.

27  The video evidence did not show Mr. Minozzi holding any weapon, Mr. Robertson admitted that

28  he never saw Mr. Minozzi with a weapon, and the police did not find a weapon when they tended

to Mr. Minozzi at the scene.  The stab wound was very deep: entering in the abdomen and reaching a vertebra.  There also was circumstantial evidence of guilt in that Mr. Robertson had directed the destruction of evidence (by instructing D.J. to dispose of the knife and the jacket he wore during the stabbing) and had fled town within a few days under an assumed name.  The murder case was strong and Mr. Robertson's unreasonable self-defense defense was weak.  Unlike the situation described in *Ford*, the case against Mr. Robertson was not a "thin, circumstantial case."  967 F.3d at 1044;  *cf. United States v. Young*, 470 U.S. 1, 19–20 (1985) ("any lingering doubt" that the prosecutor vouching for witnesses' credibility and expressing his personal opinion in defendant's guilt made the trial fundamentally unfair was removed by the overwhelming evidence of defendant's guilt).  Also, the jury did not appear to struggle with this case and returned a verdict within less than a day (CT 438, 440), which was in stark contrast to the 4-day deliberations, a temporary deadlock and a split verdict in *Ford*.

Second, the prosecutor's statement did not amount to a misstatement of the evidence and was not prominent, either as part of his argument or part of overall trial.  The statement was made in the prosecutor's initial closing argument, rather than (as in *Ford)* at the end of the rebuttal argument.   The statement was but a very small part of the prosecutor's argument, comprising 2-3 sentences of an argument that took 27 pages of the reporter's transcript (and later was followed by a rebuttal argument that took 6 pages of the reporter's transcript).  *See* RT 867-894; 958-964.

Third, although the judge did not instruct the jury to disregard the comment, it is important to note that the defense had not objected or asked for a curative instruction.  The absence of a curative instruction certainly did not amplify the problem.  This distinguishes Mr. Robertson's case from *Ford*, where the trial court's comments after an objection was made essentially confirmed that the presumption of innocence was over before deliberations began.  *See Ford*, 976 at 1043.

Fourth, the defense had an opportunity to respond to statement.  The comment was made in the prosecutor's initial summation and therefore the defense had the opportunity to comment on it during the defense closing argument.  Again, this distinguishes Mr. Robertson's case from the *Ford* case, where the comment occurred at the very end of the prosecutor's rebuttal argument, and

United States District Court
Northern District of California

1   left the defense no opportunity to comment on it.  *See* 967 F.3d at 1043-44.

2        Finally, as mentioned earlier, the comment was part of a broader argument by the

3   prosecutor that the evidence, considered as a whole, proved guilt beyond a reasonable doubt.  And

4   the jury was properly instructed on the presumption of innocence, as mentioned earlier.

5        When the prosecutor's statement that the presumption of innocence had ended is viewed in

6   light of all these circumstances, the California Court of Appeal's rejection of the claim was not

7   contrary to or an unreasonable application of *Darden,* which requires the reviewing court to

8   determine whether the prosecutor's comment so infected the trial with unfairness as to make the

9   resulting conviction a denial of due process.  This prosecutorial misconduct claim fails.

10        2.    Comment That Destruction of Evidence Was Direct Evidence of Guilt

11        The next alleged instance of prosecutorial misconduct concerned a statement about the

12   evidence that Mr. Robertson had instructed D.J. to dispose of evidence, namely, the knife Mr.

13   Robertson used to stab Mr. Minozzi and a jacket with a distinctive insignia that Mr. Robertson

14   wore during the stabbing.  The prosecutor argued:

15            If [defendant] asks somebody to get rid of evidence. If he tried
              himself to get rid of evidence, this is proof of a consciousness of
16            guilt, knowing that he's guilty. [¶] *It's not circumstantial evidence;
              it's direct evidence*. He lied. He tried to get rid of the evidence. And
17            [D.J.] brought it to the police; told the police where it was.

18   RT 963 (emphasis added).

19        Mr. Robertson contends that the prosecutor misstated the law because destruction of

20   evidence would be circumstantial, rather than direct, evidence of guilt.

21        The California Court of Appeal rejected Mr. Robertson's claim that the prosecutor engaged

22   in misconduct by telling jurors that his efforts to dispose of the knife and jacket were "direct"

23   evidence of his guilt.  That court discussed the claim under the state law standard for prosecutorial

24   misconduct and determined that there was no basis for assuming that the prosecutor acted in other

25   than good faith when he misspoke with respect to the concepts of direct and circumstantial

26   evidence.[9]  That court also noted that the prosecutor had warned the jury that his comments were

27   _____

28   [9] That the state appellate court only discussed the state law issue is evident from its conclusion that
     there was "no basis for assuming that the prosecutor acted other than in good faith when he

41

1    not evidence and that the *judge instructed on the law*.  The jury instructions included multiple

2    instructions on direct and circumstantial evidence, including an instruction that both are acceptable

3    and of equal weight.

4            Because the California Court of Appeal denied the federal constitutional claim without

5    explanation, this Court "must determine what arguments or theories supported or . . . could have

6    supported, the state court's decision; and then it must ask whether it is possible fairminded jurists

7    could disagree that those arguments or theories are inconsistent with the holding in a prior

8    decision of [the U.S. Supreme] Court."  *Harrington*, 562 U.S. at 102.

9            The California Court of Appeal reasonably could have determined that the misstatement

10   that the destruction of evidence was direct, rather than circumstantial, evidence of guilt did not

11   render the trial fundamentally unfair so as to warrant relief under *Darden*.  The state appellate

12   court reasonably could have determined that the comment, in the context of all the prosecutor's

13   comments and the court's instructions, did not render the trial fundamentally unfair.  The

14   prosecutor's misstatement was on a minor point – whether particular evidence was direct or

15   circumstantial – and the jury instructions adequately covered the point with the correct law.  There

16   was no misstatement about the evidence, as there was testimony that, shortly after the stabbing,

17   Mr. Robertson had directed D.J. to dispose of the knife and the jacket he had worn during the

18   stabbing.  And the meaning of the evidence, especially trying to dispose of the murder weapon

19   right after the killing, was fairly unmistakable as an effort to avoid being caught for the crime –

20   reflecting an awareness of guilt.

21           The prosecutor had pointed out that his argument did not constitute evidence and that the

22   jurors had to apply the law as set out in the jury instructions given by the court.  RT 868-69.  The

23   jury was instructed on the definition of direct and circumstantial evidence.[10]  And the jury was

24   _____

25   misspoke with respect to the concepts of direct and circumstantial evidence."  *Robertson*, 2016
     WL 3014803, at *13.   As explained in Section D.2.ii, above, the prosecutor's motive is part of the
26   state law analysis but not the federal due process analysis.

27   [10] The jury instructions defined direct and circumstantial evidence, and told the jury that "[b]oth
     direct and circumstantial evidence are acceptable types of evidence to prove or disprove the
28   elements of a charge, including intent and mental state and acts necessary to a conviction, and
     neither is necessarily more reliable than the other. Neither is entitled to any greater weight than the

given an instruction on evidence of consciousness of guilt that informed the jury that such evidence alone could not prove guilt.[11]  Mr. Robertson does not challenge the correctness of the instructions.  Following the instructions given, the jury would have been aware that both direct and circumstantial evidence are acceptable types of evidence, and that a defendant's efforts to hide evidence "may show the defendant was aware of his guilt" but was not alone enough evidence for the jury to find him guilty.  The court also instructed that the jurors "must follow the law as I explain it to you, even if you disagree with it.  If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."  CT 395 (CALCRIM 200).  Mr. Robertson has provided no reason to depart from the normal presumption that jurors follow the court's instructions.  *See Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985).

Given the clear evidence of Mr. Robertson's effort to hide the knife and jacket, the video that showed the circumstances of Mr. Robertson stabbing the victim, and the jury instructions explaining direct and circumstantial evidence as well as evidence of consciousness of guilt, the California Court of Appeal reasonably could have determined that the prosecution's misstatement that getting rid of evidence was direct, rather than circumstantial, evidence of guilt had no impact on the jury's assessment of the evidence and did not render the trial fundamentally unfair.  This prosecutorial misconduct claim fails.

3.      Comment About the Reason for Mr. Robertson Hitting D.J.

The final alleged instance of prosecutorial misconduct concerned a statement about the reason for Mr. Robertson hitting D.J.  The prosecutor argued:  "[Defendant] is a guy who is taking the money from an 18–year–old prostitute and beating her up *when she doesn't bring home*

---

other. You must decide whether a fact in issue has been proved based on all the evidence."  CT 400 (CALCRIM 223); *see also* CT 401 (CALCRIM 224).

[11] The jury was instructed:  "If the defendant tried to hide evidence, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself.  [¶]  If someone other than the defendant tried to conceal or destroy evidence, that conduct may show the defendant was aware of his guilt, but only if the defendant was present and knew about that conduct, or, if not present, authorized the other person's actions.  It is up to you to decide the meaning and importance of this evidence.  However, evidence of such conduct cannot prove guilt by itself."  CT 219 (CALCRIM 371, as modified).

United States District Court
Northern District of California

*enough dough."* RT 886 (emphasis added).  Mr. Robertson argues that the italicized phrase

misstated the evidence because the testimony did not connect his beating of D.J. to any

deficiencies in her earnings as a prostitute.

The California Court of Appeal rejected the claim that there was prosecutorial misconduct

when the prosecutor argued that Mr. Robertson had hit D.J. for not earning enough money as a

prostitute.  The court discussed the claim under the state law standard for prosecutorial misconduct

and determined that there was no basis for assuming that the prosecutor acted in other than good

faith when he misstated the facts.  The California Court of Appeal explained that the misstatement

of the facts appeared to be a genuine error in recollection by the prosecutor that was shared by the

trial court.  *Robertson*, 2016 WL 3014803, at *13.

Because the California Court of Appeal denied this part of the federal constitutional claim

without explanation, this Court "must determine what arguments or theories supported or . . .

could have supported, the state court's decision; and then it must ask whether it is possible

fairminded jurists could disagree that those arguments or theories are inconsistent with the holding

in a prior decision of [the U.S. Supreme] Court."  *Harrington*, 562 U.S. at 102.

The California Court of Appeal reasonably could have determined that this misstatement

of the evidence did not make the trial fundamentally unfair.  As the state appellate court noted, the

prosecutor's misrecollection of the evidence was shared by the trial court.  Outside the presence of

the jury, defense counsel objected to the statement as contrary to the evidence; the prosecutor

responded that he recalled the evidence being that Mr. Robertson had admitted hitting D.J. when

she did not make enough money.  RT 896.  The trial court had the same recollection of the

evidence.  RT 896.  In fact, the trial evidence consisted of Mr. Robertson responding "No" when

asked whether he beat D.J. if she did not make enough money.  RT 695.[12]   The court of appeals

---

[12] Mr. Robertson, who was at least 20 years older than D.J., testified that D.J. gave him all the
money D.J. made, that D.J. had 4-5 partners per day, that Mr. Robertson took her to half a dozen
cities to do her job, and that he hit her on several occasions.  RT 693-96.  However, he testified
"no" in response to the prosecutor's question, "would you hit her when you got made at her for not
making enough money?"  RT 696.

Although the jury never heard the evidence, D.J. had told the police in a videotaped pretrial
statement that Mr. Robertson repeatedly beat her if she did not make enough money, if she did not

United States District Court
Northern District of California

1  reasonably could have determined that the misdescription of the evidence was on such a minor

2  point that it did not make the trial fundamentally unfair: given that the jury heard that Mr.

3  Robertson was D.J.'s pimp and had hit her several times, the jury's view of him was not made

4  materially worse by hearing that the reason Mr. Robertson hit her was because she was

5  underperforming as a prostitute.[13]  The California Court of Appeal's rejection of the claim was not

6  an unreasonable application of *Darden*.

7       Mr. Robertson is not entitled to the writ on any of the three prosecutorial-misconduct

8  claims because he has not shown that the California Court of Appeal's rejection of any of those

9  claims was an unreasonable application of *Darden*'s rule that a due process violation occurs only

10  when the prosecutor's conduct makes the trial "fundamentally unfair."  *See Darden,* 477 U.S. at

11  181.

12  E.    <u>Cumulative Error Claim</u>

13       In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

14  the cumulative effect of several constitutional errors may still prejudice a defendant so much that

15  his conviction must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003)

16  (reversing conviction where multiple constitutional errors "undermine[d] every important element

17  of proof offered by prosecution").  Here, there were not multiple constitutional errors.  Mr.

18  Robertson therefore is not entitled to habeas relief under the cumulative error doctrine.

19  F.    <u>Claim of Insufficiency of Evidence</u>

20       Mr. Robertson claims that there was insufficient evidence of premeditation and

21

22  ──────────────────

want to go out to work, or if she performed her work in a manner of which he did not approve.
*See* CT 289-31, 235-36, 239-42, 248-49; RT 278, 283, 765-66.

23

24  [13] The challenged comment was part of the prosecutor's attack on Mr. Robertson's credibility in
which the prosecutor listed various reasons to disbelieve Mr. Robertson.  The prosecutor stated
that it was for the jury to decide whether to believe Mr. Robertson's story that Mr. Minozzi was
25  attacking him and that Mr. Robertson only used that force necessary to defend himself.  "[H]is
credibility is for you to analyze, because he's telling ya he killed this man in self-defense.  The
26  [sic] this is a guy who is taking the money from an 18-year-old prostitute and beating her up *when
she doesn't bring home enough dough.*  A guy who's a drug dealer and convicted felon with
27  weapons.  Who, after he killed this man, fled, told the young lady to discard the weapon.  Get rid
of this weapon.  Get rid of this jacket.  Let's get the hell out of here and go to Atlanta, Georgia,
28  under different names."  RT 886 (emphasis added).  The jury's impression of Mr. Robertson
would likely have been just as bad even if the prosecutor omitted the italicized phrase.

1    deliberation to support the conviction of first-degree murder.  He urges that, "at minimum the

2    Court must reduce his conviction to second degree murder."  Docket No. 13 at 80.

3            1.    State Court Decision

4            The California Court of Appeal rejected Mr. Robertson's challenge to the sufficiency of

5    the evidence.  That court articulated the correct legal test, i.e., the reviewing court "must view the

6    evidence in the light most favorable to the judgment and presume in favor of the judgment the

7    existence of every fact the trier of fact could reasonably deduce from the evidence. To be

8    sufficient, evidence of each of the essential elements of the crime must be substantial and we must

9    resolve the question of sufficiency in light of the record as a whole."  *Robertson*, 2016 WL

10   3014803, at *14.  The appellate court further explained that, if "a rational trier of fact could find

11   the essential elements of the crime proven beyond a reasonable doubt," there is no violation of the

12   federal or state right to due process.  *Id.*

> [W]here, as here, the charge is first degree murder, a jury is entitled
> to find the defendant committed premeditated and deliberate murder
> where there is evidence the defendant inflicted fatal force upon the
> victim while acting with intent to cause death after sufficient time,
> no matter how brief, to reflect on the consequences of his behavior.
> (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294
> ["[p]remeditation and deliberation ... can occur in a brief interval:
> "'[t]he test is not time, but reflection,'" as "'[t]houghts may
> follow each other with great rapidity and cold, calculated judgment
> may be arrived at quickly'"'"]; see also 40A Am.Jur.2d, Homicide,
> § 251, p. 92 ["Deaths caused in the following manner are sufficient
> to infer the specific intent required for a conviction of murder: [¶] ...
> [¶] the use of a deadly weapon upon a vital part of the victim's
> body"; fn. omitted].)
>
> Here, we conclude the substantial evidence standard has been met.
> In particular, the record reflects, first, that defendant perceived the
> victim had insulted or somehow disrespected him when he blocked
> the entrance to the Stop and Go Market and then "shoulder[ed]"
> defendant in the chest as defendant tried to leave.  In addition, there
> was evidence in the form of surveillance video that, after the victim
> left the store without making further comment to defendant,
> defendant followed the victim for about 46 feet from a slight
> distance away as the victim walked down the alleyway.  Then, as the
> video further reflects, defendant approached the victim from behind
> and stabbed him so ferociously with his knife that, in one continuous
> motion, he pierced the victim's aorta and penetrated five inches
> deep, reaching his spine.  Finally, as defendant himself admitted, he
> routinely carried this knife in a clip in his pocket so that he could
> easily retrieve and use the knife should it become necessary.  Here,
> however, not only was the victim unarmed, he at no point swung at

1
2
3
4
5
6
7
8

> defendant prior to being stabbed.  This evidence, viewed collectively, sufficed to support the jury's finding of first degree murder.  (See *People v. Memro, supra*, 11 Cal.4th at p. 863 [upholding a finding of premeditated murder where the defendant pursued the victim on foot before cutting his throat]; *People v. Bolden* (2002) 29 Cal.4th 515, 560–561 ["defendant could have had no other intent than to kill" where he "plunged" the knife five to six inches deep into the victim's back and where there was no evidence of a struggle or quarrel at the scene]; *People v. Moore* (2002) 96 Cal.App.4th 1105, 1114–1115 ["Defendant argues there is no evidence of a specific intent to kill, highlighting his testimony that he intended to stab but not kill the victim.  However, defendant stabbed the victim not in the arm or leg, but in the abdomen, an extremely vulnerable part of the body. ...  While a less violent attack might have been consistent with the claim of an intent to stab but not to kill, this was not such an attack"].)

9    *Robertson*, 2016 WL 3014803, *14-15.

10        As the last reasoned decision from a state court, the California Court of Appeal's decision

11   is the decision to which § 2254(d) is applied.  *See Ylst*, 501 U.S. at 803-04; *Barker*, 423 F.3d at

12   1091-92.  Mr. Robertson is entitled to habeas relief only if the California Court of Appeal's

13   decision was contrary to, or an unreasonable application of, clearly established federal law from

14   the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the

15   evidence presented.

16        2.   Analysis of Federal Due Process Claim

17        The Due Process Clause "protects the accused against conviction except upon proof

18   beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

19   charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  A court reviewing a conviction does not

20   determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt, but

21   rather determines whether, "after viewing the evidence in the light most favorable to the

22   prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond

23   a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Only if no rational trier of

24   fact could have found proof of guilt beyond a reasonable doubt may a court conclude that the

25   evidence is insufficient.  *See Jackson*, 443 U.S. at 324.  The "prosecution need not affirmatively

26   'rule out every hypothesis except that of guilt,'" and the reviewing federal court "'faced with a

27   record of historical facts that supports conflicting inferences must presume – even if it does not

28   affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the

United States District Court
Northern District of California

47

1    prosecution, and must defer to that resolution.'"  *Wright v. West*, 505 U.S. 277, 296-97 (1992)

2    (quoting *Jackson*, 443 U.S. at 326).

3          "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the

4    evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts

5    to ultimate facts.'"  *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (per curiam) (citing *Jackson*,

6    443 U.S. at 319).  "[O]n habeas review, a federal court may not overturn a state court decision

7    rejecting a sufficiency of the evidence challenge" unless "the state court decision was objectively

8    unreasonable."  *Id.* at 2062 (internal quotation marks omitted).

9          The *Jackson* standard is applied to a crime as that crime is defined by state law.  *Jackson*,

10   443 U.S. at 324 n.16.  Under California law, murder is the unlawful killing of a human being with

11   malice aforethought.  Cal. Penal Code § 187(a).  A murder that is "willful, deliberate, and

12   premeditated" is first degree murder.  *Id.* at § 189.

13         California courts have identified three common indicators that a killing was deliberate and

14   premeditated: (1) planning activity, (2) motive, and (3) a particular or exacting manner of killing.

15   *People v. Anderson*, 70 Cal. 2d 15, 27 (Cal. 1968).  "A reviewing court will sustain a conviction

16   where there exists evidence of all three [factors], where there is 'extremely strong' evidence of

17   prior planning activity, or where there exists evidence of a motive to kill, coupled with evidence of

18   either planning activity or a manner of killing which indicates a preconceived design to kill."

19   *People v. Edwards*, 54 Cal. 3d 787, 813-814 (Cal. 1991).  The *Anderson* factors are not elements

20   of the crime, and not all three factors need to be present to sustain a finding of premeditation and

21   deliberation.  *People v. Garcia*, 78 Cal. App. 4th 1422, 1427 (2000).  Instead, the *Anderson* factors

22   are guidelines to aid a reviewing court in determining whether the elements of premeditation and

23   deliberation are present, i.e., "whether the evidence is supportive of an inference that the killing

24   was the result of preexisting reflection and weighing of considerations rather than mere

25   unconsidered or rash impulse."  *People v. Perez*, 2 Cal. 4th 1117, 1125 (1992).  The *Anderson*

26   factors are used by federal habeas courts evaluating a sufficiency-of-the-evidence challenge to a

27   first-degree murder conviction in California.  *See Davis v. Woodford*, 384 F.3d 628, 640 (9th Cir.

28   2004).

1    Here, it was not an unreasonable application of clearly established federal law for the

2    California Court of Appeal to conclude that the evidence was sufficient to support the jury's

3    verdict that Mr. Robertson committed first-degree murder.  The identity of the killer was not

4    disputed at trial, and the focus was instead on Mr. Robertson's mental state at the time he stabbed

5    Mr. Minozzi.

6    All three *Anderson* factors -- planning activity, manner of killing, and motive -- that tend to

7    show deliberation and premeditation were present.  First, there was evidence of planning, as the

8    California Court of Appeal recognized.  The evidence showed that Mr. Robertson engaged in an

9    angry confrontation with Mr. Minozzi and then followed him over 46 feet to the alleyway before

10   stabbing him.  Following the victim for such a distance before stabbing him demonstrated

11   planning, as did the fact that Mr. Robertson followed Mr. Minozzi until he was out of view of

12   people on the street before stabbing him.  *Cf. People v. Memro*, 11 Cal. 4th 786, 863 (Cal. 1995)

13   (running after victim before cutting his throat suggested premeditation).  This evidence that Mr.

14   Robertson followed the victim for over 46 feet supported a finding of premeditation and

15   deliberation as it tended to show some planning and time for reflection before he inflicted the fatal

16   wound.

17   Next, there was evidence of a manner of killing that was suggestive of deliberation and

18   premeditation.  The evidence that Mr. Robertson plunged the knife five inches into Mr. Minozzi's

19   abdomen, cutting a hole about an inch across in his aorta as the knife tip went into his vertebrae,

20   was a manner of killing that tended to show deliberation and premeditation.  *See* RT 461-65.

21   Evidence of the manner of killing can alone be sufficient to sustain a verdict, as can evidence of

22   the manner of killing in conjunction with other evidence.  *See Davis*, 384 F.3d at 640-41

23   (strangulation for up to five minutes plus evidence of intent to keep victim from escaping were

24   sufficient for rational jury to infer premeditation and deliberation); *see, e.g., People v. Mendoza,*

25   52 Cal. 4th 1056, 1071 (Cal. 2011) (single shot directed at an area of the body likely to cause

26   death can support an inference that the defendant had a deliberate intent to kill), *abrogation on*

27   *other grounds recognized in People v. Whitt*, 51 Cal. 3d 620, 661 (Cal. 1990); *People v. Caro* 46

28   Cal. 3d 1035, 1050 (Cal. 1988) ("a close-range gunshot to the face is arguably sufficiently

United States District Court
Northern District of California

49

'particular and exacting' to permit an inference that defendant was acting according to a preconceived design"); *People v. Silva*, 25 Cal. 4th 345, 369 (Cal. 2001) ("The manner of killing – multiple shotgun wounds inflicted on an unarmed and defenseless victim who posed no threat to defendant – is entirely consistent with a premeditated and deliberate murder"); *People v. Koontz*, 27 Cal. 4th 1041, 1082 (Cal. 2002) (finding manner of killing to support premeditation and deliberation where defendant shot at a vital area (i.e., the abdomen) of the victim's body at close range and then prevented witness from calling an ambulance for victim); *Ledesma v. McDowell*, 2020 WL 3052762, at *13 (C.D. Cal. 2020) (finding manner of killing supported finding of premeditation and deliberation where defendant emerged from his apartment and lunged at unarmed victim's neck and chest, quickly stabbing him 3 times). The evidence that Mr. Robertson stabbed the unarmed victim in the area of vital organs and plunged the knife about 5 inches into the victim's body, was a manner of killing that supported an inference that Mr. Robertson acted with premeditation and deliberation.

Finally, there was substantial evidence of a motive to kill Mr. Minozzi. As the California Court of Appeal recognized, there was evidence that Mr. Robertson felt that Mr. Minozzi had insulted him by shouldering Mr. Robertson out of the way as Minozzi left the market. The fact that feeling disrespected provides a trivial motive for a killing does not negate the fact that it is some evidence of motive. *See People v. Jackson*, 49 Cal. 3d 1170, 1200 (Cal. 1989) ("[T]he law does not require that a first degree murderer have a rational motive for killing. Anger at the way the victim talked to him ... may be sufficient." (citation and internal quotation marks omitted)); *see People v. Miranda*, 44 Cal. 3d 57, 87-88 (Cal. 1987) (defendant's anger over a perceived insult, even if irrational, showed a motive to kill), *abrogation on other grounds recognized in People v. Marshall*, 50 Cal. 3d 907, 933 n.4 (Cal. 1990). The motive evidence supported an inference that Mr. Robertson acted with premeditation and deliberation.

Given the existence of evidence of planning, manner of killing, and motive present in this case that suggested premeditation and deliberation, it was not an unreasonable application of clearly established federal law for the California Court of Appeal to conclude that the evidence was sufficient to support the first-degree murder conviction.

1    Two of the cases cited by the California Court of Appeal address the existence of an intent

2    to kill, rather than premeditation and deliberation, even though Mr. Robertson only challenged on

3    appeal the sufficiency of the evidence of premeditation and deliberation.  Specifically, the

4    California Court of Appeal cited *People v. Bolden*, 29 Cal. 4th 515, 560-61, a case that did not

5    discuss premeditation or deliberation and instead discussed intent to kill, as the issue was whether

6    intent to kill was an element of a robbery-murder special circumstance killing.  The California

7    Court of Appeal also cited *People v. Moore*, 96 Cal. App. 4th 1105, 1114-15 (Cal. Ct. App. 2002),

8    a case that discussed whether defendant acted with intent to kill versus an intent to just stab the

9    victim; the case did not discuss premeditation and deliberation.  Here, Mr. Robertson did not

10   contest on appeal that the evidence showed an intent to kill, thus indicating that the California

11   Court of Appeal's citations to *Bolden* and *Moore* were unnecessary.

12   The citations to *Bolden* and *Moore*, and the California Court of Appeal's mention of an

13   intent to kill, do not render that court's decision deficient because the rest of that court's analysis

14   shows that the court was conducting the proper inquiry.  First, *Bolden* and *Moore* were perhaps

15   surplusage (because Mr. Robertson did not challenge sufficiency of the evidence of intent to kill

16   on appeal (although he had challenged it in the trial court, *see* RT 914, 928)) but they were not

17   relied upon for a misstatement of law.  Both were cited to establish intent to kill (which was a

18   correct statement of those cases), rather than to establish premeditation and deliberation (which

19   was the issue in Mr. Robertson's case).   Second, as the block quote in Section F.1 shows, *Bolden*

20   and *Moore* were part of a string of case citations, the first of which was a case regarding

21   premeditation, i.e., *People v. Memro*, 11 Cal. 4th at 863.  The text of the discussion preceding the

22   string citation that included *Memro*, *Bolden*, and *Moore* plainly addresses the *Anderson* factors of

23   motive, planning, and manner of killing.  The California Court of Appeal pointed to evidence that

24   Mr. Robertson "perceived the victim had insulted or somehow disrespected him," (i.e., motive

25   evidence); Mr. Robertson "followed the victim for about 46 feet" into an alleyway (i.e., planning

26   evidence); and Mr. Robertson stabbed him "so ferociously with his knife that, in one continuous

27   motion, he pierced the victim's aorta and penetrated five inches deep, reaching his spine," (i.e.,

28   manner-of-killing evidence).  *See Robertson*, 2016 WL 3014803, at *15.  Lastly, the California

United States District Court
Northern District of California

1   Court of Appeal correctly articulated the legal test for evaluating a sufficiency-of-the-evidence

2   claim, i.e., whether a rational trier of fact could find the essential elements of the crime proven

3   beyond a reasonable doubt, viewing the evidence in the light most favorable to the judgment.  *Id.*

4   at *14.  In light of these several circumstances, and viewed in the context of the overall discussion

5   of the challenge to the sufficiency of the evidence to support the determination that Mr. Robertson

6   acted with deliberation and premeditation, the citations to *Bolden* and *Moore* do not undermine

7   confidence in the adequacy of the California Court of Appeal's decision.

8         Mr. Robertson does not surmount that high hurdle that *Jackson* and § 2254(d) place before

9   a petitioner trying to overturn a conviction on the ground that the evidence was insufficient to

10  support the verdict.  The California Court of Appeal's rejection of Mr. Robertson's due process

11  challenge to the sufficiency of the evidence was not an unreasonable application of, or contrary to,

12  any holding of the U.S. Supreme Court.  Mr. Robertson is not entitled to the writ of habeas corpus

13  on this claim.

14  G.   No Certificate of Appealability

15        A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in

16  which "reasonable jurists would find the district court's assessment of the constitutional claims

17  debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of

18  appealability is **DENIED**.

## VI.   CONCLUSION

20        For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**.  The Clerk

21  shall close the file.

23        **IT IS SO ORDERED**.

25  Dated: March 10, 2021

_____
EDWARD M. CHEN
United States District Judge

52